Earl D. MILLER, Plaintiff,

v.

**THE HARTFORD LIFE INSURANCE COMPANY, Defendant.**

No. CIV.03–40056.

United States District Court,
E.D. Michigan,
Southern Division.

Dec. 6, 2004.

Carol A. Kuhnke, Davis & Kuhnke, Peter A. Davis, Davis & Kuhnke, Ann Arbor, MI, for Earl D. Miller, Plaintiff.

Michael A. Alaimo, Michael A. Alaimo, Miller, Canfield, (Detroit), Detroit, Michael A. Alaimo, Dickinson Wright, Bloomfield Hills, MI, for Hartford Life Insurance Company, Defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

GADOLA, District Judge.

## I. Introduction

Before the Court are the parties' cross-motions for judgment on the administrative record. Because the Court concludes that Plaintiff is not entitled to benefits under an insurance contract, the Court will grant Defendant's motion and deny Plaintiff's motion.

## II. Statement of Facts

Plaintiff, the husband of Barbara Miller, had an accidental death and dismemberment policy with defendant Hartford Life Insurance Company ("Hartford"). Under the policy, Hartford agreed to pay benefits if an injury within the terms of the policy occurred. Plaintiff and his wife were covered under this policy. This case concerns whether Plaintiff may recover under the policy for his wife's death due to complications from surgery.

On January 2, 1997, Mrs. Miller had her gallbladder removed. Almost two years later, on December 15, 1998, doctors found a remaining gallstone. The doctor thought that the stone was "perhaps in her cystic duct remnant." (Administrative Record ("A.R.") at 54). Doctors performed an endoscopic retrograde cholangiopancreatography ("ERCP") on Mrs. Miller on December 18, 1998 to remove the gallstone. The gallstone was not removed, and doc-tors ceased working due to Mrs. Miller's agitation. Mrs. Miller died the next day, December 19, 1998.

The administrative record details the causes of Mrs. Miller's death. According to the certificate of death, amended on May 16, 2001, the immediate cause of death was peritonitis. The underlying cause was acute pancreatitis. As a "significant condition[ ] contributing to death but not resulting in the underlying cause [i.e. acute pancreatitis]," the certificate listed, "Status Post [ERCP] and Complications." (A.R. at 134). The medical examiner classified the cause of death as an "accident." (A.R. at 134). Under the section entitled "Describe How Injury Occurred," he wrote, "Inadvertent injury of the biliary tree during ERCP." (A.R. at 134).

In the autopsy protocol, amended on May 16, 2001, the cause of death is listed as "Peritonitis due to Acute Pancreatitis due to Cholelithiasis." The contributory cause is listed as "Status Post [ERCP] and Complications." (A.R. at 36). In the "Internal Examination" section, under "Body Cavities," the investigator wrote, "There is an accumulation of purulent material in the abdominal cavity." (A.R. at 38). Under "Liver and Biliary System," he wrote, "There is a 1 cm in diameter yellow multi-shaped stone in the main bile duct." (A.R. at 39).

After his wife's death, plaintiff filed a "Proof of Loss–Accidental Death" form with Hartford on August 6, 2001. Hartford denied this claim in a letter dated February 4, 2002. Hartford based its denial on the "medical or surgical treatment" exclusion of the policy. (A.R. at 29–32). Plaintiff appealed this decision with Hartford in a letter dated March 15, 2002. (A.R. at 22). Hartford denied this appeal on May 17, 2002. Hartford asserted that

Mrs. Miller died from pancreatitis, a sickness or disease under the policy, and not from complications of the surgery. Hartford also asserted that if plaintiff died from complications of the surgery, recovery would be denied under the medical or surgical treatment exclusion. (A.R. at 12–13).

Plaintiff subsequently filed this complaint in the Wayne County Circuit Court of Michigan. Defendant removed the action to this Court on March 7, 2003, under diversity and federal question jurisdiction. This is a denial of benefits claim under the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. § 1132(a)(1)(B) (2004). Both plaintiff and defendant have filed motions for judgment on the administrative record.

### III. Standard of Review

The Court reviews ERISA denial of benefits claims "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The *de novo* standard "applies to the factual determinations as well as to the legal conclusions of the plan administrator." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir.1998). When undertaking a *de novo* review, the Court "simply decides whether or not it agrees with the decision under review." *Anderson v. Great W. Life Assurance*, 777 F.Supp. 1374, 1376 (E.D.Mich.1991) (Gadola, J.) (quoting *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir.1990)). "The administrator's decision is accorded no deference or presumption of correctness." *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 809 (6th Cir.2002). The court's role is to "determine whether the

administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Id.* In this case, the Court finds no language in the Hartford's policy granting discretionary authority to Hartford. Therefore, the Court reviews the finding of the plan administrator under the *de novo* standard. Defendant does not dispute the application of the *de novo* standard.

To interpret ERISA claims, the Court "appl[ies] 'general rules' of contract law as part of the federal common law.... The federal common law may draw on state law principles, but state law is not controlling authority." *Cassidy v. Akzo Nobel Salt, Inc.*, 308 F.3d 613, 615 (6th Cir.2002). The terms of an ERISA policy should be examined "according to their plain meaning, in an ordinary and popular sense." *Marquette Gen. Hosp. v. Goodman Forest Indus.*, 315 F.3d 629, 633 (6th Cir.2003). "In applying this 'plain meaning analysis,' the court 'must give effect to the unambiguous terms of an ERISA plan.'" *Cassidy*, 308 F.3d at 618 (quoting *Lake v. Metro. Life Ins. Co.*, 73 F.3d 1372, 1379 (6th Cir.1996)).

### IV. Analysis

#### A. Whether the Harm Complained of Qualifies as an "Accident" Under the Hartford Policy

Plaintiff's Hartford policy defines "injury" as follows:

*Injury* means bodily injury resulting directly from *accident* and independently of all other causes which occurs while the Covered Person is covered under this policy. Loss resulting from:

    a) sickness or disease, except a pus-forming infection which occurs through an accidental wound; or

    b) medical or surgical treatment of a sickness or disease;

is *not* considered as resulting from injury.

(The Hartford Policy at 150) (emphasis added). The Court must therefore consider two aspects of the policy: (1) whether the injury to Mrs. Miller is an "accident" and (2) whether to apply either the "sickness or disease" exclusion or the "medical or surgical treatment of a sickness or disease" exclusion.

The Court first considers whether Mrs. Miller's injury is an "accident." Plaintiff alleges that negligence by the doctors during his wife's operation resulted in her death. Plaintiff thus claims that the medical malpractice of his wife's doctors constitutes an "accident" under the terms of the policy. When interpreting exclusionary language in a policy similar to the language here, courts routinely hold that medical malpractice is not an accident. For example, in an unpublished opinion, the Court of Appeals for the Sixth Circuit held that medical malpractice was not an accident. *Swisher–Sherman v. Provident Life & Ins. Co.*, No. 93–3959, 1994 WL 562050, 1994 U.S.App. LEXIS 28768, at *8 (6th Cir. Oct. 13, 1994). In *Swisher–Sherman*, an insured man received a prescription for heart medication. The pharmacist gave him the wrong drug, and the man died. His wife sought benefits from the defendant insurance company, claiming that her husband's death was an "accident." The insurance company decided that the man's death was excluded from coverage under language which read, "[N]o benefits shall be paid if [the insured's] loss directly or indirectly results from: ... disease of any kind, or medical or surgical treatment for any such infirmity or disease." *Id.* at *2–3. The court held that the clear and unambiguous meaning of the contract indicated that policy did not cover this particular incident, since the drugs were given to the man as part of his medical treatment. The court

stated, "[e]very act of medical malpractice is to some extent an accident, if one equates 'accident' with 'unintended,' because it is outside the course of the intended medical treatment.... [S]uch medical mishaps can only occur during the course of treatment; and that's all the exclusionary provision here cares about." *Id.* at *5–6. Therefore, the court held that an accidental death and dismemberment policy did not cover loss from medical malpractice. The facts in *Swisher–Sherman* are analogous to those in the present case, in which Plaintiff contends that his accidental death and dismemberment policy covered his wife's death from alleged medical malpractice.

Similarly, a court in this district has held that an accidental death benefit policy did not cover an injury caused by poor medical treatment. *Pickard v. Transamerica Occidental Life Ins. Co.*, 663 F.Supp. 126, 127 (E.D.Mich.1987) (Woods, J.). In *Pickard,* a man visited the hospital for treatment of ulcerative colitis. To prepare for a colonoscopy, he drank a solution; however, he was given the wrong solution, and died. The man's insurance policy excluded coverage "if the individual's loss shall directly or wholly result from: ... (c) bodily or mental infirmity, disease of any kind, or as a result of medical or surgical treatment therefor." *Id.* at 126. The court held that the solution was given to the man in preparation for medical treatment, and hence was not covered by his accidental death benefit policy. "[T]he clear language of the policy and the weight of authority suggest that the policy was meant to exclude this kind of mishap." *Id.* at 127.

Courts in other jurisdictions have reached similar results. *See, e.g., Senkier v. Hartford Life & Accident Ins. Co.*, 948 F.2d 1050, 1053 (7th Cir.1991) (holding that a patient's death from a punctured

heart caused by a wandering catheter tube was not an accident, since "[m]edical treatment is often risky and when the risk materializes and the patient dies we do not call it dying in or because of an accident; it is death from sickness."); *Whetsell v. Mut. Life Ins. Co.*, 669 F.2d 955 (4th Cir. 1982) (holding that the use of an intravenous needle infected with bacteria was not an "accident" under an accidental death insurance policy); *Krane v. Aetna Life Ins. Co.*, 698 F.Supp. 220 (D.Colo.1988) (holding that an insured's death during exploratory surgery was a result of surgical treatment, not an accident); *Reid v. Aetna Life Ins. Co.*, 440 F.Supp. 1182 (S.D.Ill.1977) (holding that a lethal drug inadvertently given to the insured while recuperating from surgery was not an "accident").

Although these cases are not binding precedent, the Court finds their reasoning persuasive. The Court therefore holds that Mrs. Miller's injuries from alleged medical malpractice were not accidents under the policy, and therefore Plaintiff may not recover under the policy.

### B. The Two Exclusions

#### 1. The "Sickness or Disease" Exclusion

The Court's holding that Mrs. Miller's injuries were not accidents under the policy is dispositive of this case. Regardless, even if the Court were to assume that Mrs. Miller died as a result of an accident, Plaintiff would still be denied recovery under the two exclusions in the policy. The first exclusion precludes recovery for "[l]oss resulting from ... sickness or disease," unless the disease is a "pus-forming infection which occurs through an accidental wound." The Court first addresses whether this exclusion is ambiguous. After deciding that the terms are unambiguous, the Court decides that gallstones are

a "sickness or disease," which also precludes Plaintiff's recovery. Finally, the Court determines that the further exception for "pus-forming infections" does not apply in this case.

Plaintiff asserts that the terms "sickness" and "disease" are ambiguous. If Plaintiff is correct, the meaning should be construed against Hartford, since Hartford created the contract. "The federal common law ... requires that the terms of an ERISA plan be interpreted in an ordinary and popular sense, and that any ambiguities in the language of the plan be construed strictly against the drafter of the plan." *Regents of the Univ. of Mich. v. Employees of Agency Rent–A–Car Hosp. Ass'n*, 122 F.3d 336, 339–40 (6th Cir.1997).

Plaintiff cites two cases to show that "sickness" or "disease" are ambiguous terms. Regarding the first cited case, the Sixth Circuit's determination that the term "crime" is ambiguous is not relevant. *Am. Family Life Assurance Co. v. Bilyeu*, 921 F.2d 87, 89–90 (6th Cir.1990). Similarly, the Sixth Circuit's ruling in an unpublished decision that "infirmity" was an ambiguous term does not apply. *Chiera v. John Hancock Mut. Life Ins. Co.*, 3 Fed.Appx. 384, 391 (6th Cir.2001).

Defendant cites several cases to show that similar contractual provisions have been deemed unambiguous. Some of these do not discuss the terms "sickness or disease." *See Swisher–Sherman*, 1994 WL 562050, 1994 U.S.App. LEXIS 28768 (addressing the ambiguity of "indirectly results," not "sickness or disease"); *Criss v. Hartford Acc. & Indem. Co.*, No. 91–2092, 1992 WL 113370, 1992 U.S.App. LEXIS 13288 (6th Cir. May 28, 1992) (holding that the policy clearly indicated that "an absolute nexus between the accident and the loss" needed to be shown); *Pickard*, 663 F.Supp. at 127 (holding that

"medical treatment" was unambiguous term); *Whetsell v. Mut. Life Ins. Co.,* 669 F.2d at 957 (holding that "treatment or operation for disease" was unambiguous).

Two pertinent cases hold that "sickness" and "disease" are unambiguous terms. In the first, the Sixth Circuit addressed "whether an accident insurance plan should, despite its explicit language to the contrary, be read to cover injuries caused substantially or entirely by a known, preexisting disease." *Lingerfelt v. Nuclear Fuel Servs., Inc.,* No. 90–5320, 1991 WL 11615, 1991 U.S.App. LEXIS 1822, at *11–12 (6th Cir. Feb. 5, 1991). In *Lingerfelt,* an employee injured himself lowering a 250–pound motor at work. The court decided that an employee's pre-existing disc disease precluded recovery under a policy which read that it would "exclude[ ] loss resulting from ... pregnancy, childbirth, illness or disease." (*3). The court deemed the pre-existing disc disease to fall within the clear meaning of "disease" in the policy. The reasoning of *Lingerfelt* applies to this case. Both policies exclude "disease" from covered accidents. Similar to *Lingerfelt,* the injury in question was caused by a pre-existing bodily ailment.

In the second case, Defendant cites a Michigan Court of Appeals case in which an insured diabetic died during medical treatment as a result of injecting too much insulin. Her accident insurance policy allowed recovery for accidents, but excluded injuries "caused by or contributed to by Sickness, Illness, or Disease." *Green v. Voyager Prop. & Cas. Ins. Co.,* No. 234003, 2002 WL 31117041, 2002 Mich.App. LEXIS 1342, at *2 (Mich.Ct.App. Sept. 24, 2002). Addressing the supposed ambiguity of the policy, the court held that the terms were unambiguous: "[R]easonable minds cannot differ with respect to the application of the contract language to the undisputed material facts. Clearly diabe-

tes is a sickness, illness, or disease." *Green,* 2002 WL 31117041, at *2, 2002 Mich.App. LEXIS 1342, at *8. The court dismissed the insurance claim.

The Court finds the reasoning of the last two cases to be persuasive, and therefore decides that the terms "sickness or disease" are unambiguous under the insurance policy. The Court now decides whether "sickness or disease" includes the gallstones at issue in this case.

Plaintiff contends that his wife's gallstone was not a "sickness or disease," quoting several definitions from medical dictionaries in support. Defendant contends that the medical community recognizes gallstones as a "sickness or disease," offering multiple exhibits to demonstrate this. Defendant asks the court to take judicial notice of this fact.

Plaintiff and Defendant dispute the admissibility of each other's evidence. Plaintiff contends that Defendant cannot introduce medical evidence such as the articles and textbook excerpts that comprise Defendant's exhibits; Plaintiff also contends that his own introduction of dictionary definitions is valid, since such the accuracy of such definitions "cannot reasonably be questioned." Fed.R.Evid. 201. Defendant asserts that its exhibits are admissible under Federal Rules of Evidence 201 as well, maintaining that the accuracy of its sources cannot be questioned. Defendant further contends that Plaintiff's failure to argue that gallstones are not a disease at the administrative level should preclude him from so arguing now.

When reviewing the decision of the administrator, "[t]he review is limited to the record before the administrator." *Hoover v. Provident Life & Acc. Ins. Co.,* 290 F.3d at 809. *See also Wilkins v. Baptist Healthcare Sys.,* 150 F.3d at 618 ("In conducting its *de novo* review, a district court may only consider evidence that was first

presented to the administrator."). Since none of these materials were before the plan administrator, the Court decides that neither Plaintiff's medical dictionaries nor Defendant's exhibits will be admitted. Instead, the policy's provisions will be "interpreted according to their plain meaning, in an ordinary and popular sense." *Marquette Gen. Hosp. v. Goodman Forest Indus.*, 315 F.3d 629 (6th Cir.2003).

■ According to the plain meaning of the terms "sickness or disease," gallstones would be considered a sickness or disease. Under the plain meaning, a disease is an aberration from the normal condition of the body. When a person has a disease, her inner organs do not work together, causing pain and occasionally incapacitating the person.[1] Gallstones deviate from the healthy functioning of the body. They signal that something within the body, which the person is accustomed to depend on, no longer works with the same efficacy, and a painful ailment results. Although the plaintiff may contend that the ordinary meaning of "sickness" or "disease" would be limited to viruses or bacterial infections, the Court notes that cancer would be considered a "sickness" or "disease" by the layman. Another example of an ailment readily termed a "sickness or disease" without a virus or bacterial infection is appendicitis.

Moreover, other courts have referred to gallstones as a disease. *See, e.g., Barlow v. Konda*, No. 05–98–00797–CV, 2000 WL 921239, 2000 Tex.App. LEXIS 4543 (Tex. App.Ct.2000) ("[T]he date when proper surgery or treatment was not initiated for gallstones and gallbladder disease."); *Medical Serv. of District of Columbia v. Llewellyn*, 208 A.2d 734 (D.C.Ct.App.1965)

("This definition further substantiates the medical expert's testimony that gallstones are a 'disease' or 'diseased condition.' "); *People v. Hohensee*, 251 Cal.App.2d 193, 59 Cal.Rptr. 234 (1967) ("Defendants contend there is no evidence of intent to advertise a drug or device represented to have any effect in certain diseases, including cancer, cataracts, gallstones, heart and vascular diseases."). Although Louisiana courts have twice found gallstones not to be diseases when construing medical insurance contracts, those contracts contained more specific language about what constituted a "sickness" or "disease," and hence those cases are distinguishable from the present case. *See Ezernack v. Lo. Hosp. Serv., Inc.*, 380 So.2d 224 (La.App.Ct.1980); *Smith v. Reserve Nat'l Ins. Co.*, 370 So.2d 186 (Lo.App.Ct.1979).

Thus, the plain meaning of the terms and the usage of other courts points suggest holding that gallstones are within the plain meaning of sickness or disease. To show that gallstones are not a "sickness or disease," Plaintiff also analogizes the present facts to a case from another court. In that case, an insured hiker died while hiking in Nepal from liquid seeping into his lungs because of low air pressure, a condition called "high-altitude pulmonary edema." *Paulissen v. U.S. Life Ins. Co.*, 205 F.Supp.2d 1120 (C.D.Cal.2002). The insurance policy covered "accidental loss of life" for injuries caused by an accidents, with exceptions "for any loss that results from or is caused directly, indirectly, wholly or partly by ... a physical or mental sickness, or treatment of that sickness." *Id.* at 1124. The court ruled that the high-altitude pulmonary edema was not a "sickness" under the policy. The court

---

1. *See, e.g.,* Black's Law Dictionary 480 (7th ed., 1999) (A "disease" is "1. A deviation from the healthy and normal functioning of the body. 2. Special classes of pathological condi- tions with similar traits, such as having simi- lar causes and affecting similar organs. 3. Any disorder; any depraved condition.")

reasoned that "temporary conditions and indispositions are not considered to be diseases." *Id.* at 1130. The significant factors were that the insured's condition was temporary, the disorder "did not arise from some organic cause," and the hiker would have been cured without medical attention if he had simply gone to a lower elevation. *Id.*

*Paulissen* cites several cases in support of its proposition that a "disease" differs from a mere "temporary condition." None of these cases involve gallstones. *Fid. Serv. Ins. Co. v. Jones,* 280 Ala. 195, 191 So.2d 20 (1966) (holding that vertigo is not a disease); *Mfrs' Accident Indem. Co. v. Dorgan,* 58 F. 945 (6th Cir.1893) (concluding that temporary fainting spell is not a disease); *Meyer v. Fid. & Cas. Co.,* 96 Iowa 378, 65 N.W. 328 (Iowa 1895) (holding that temporary disorders such as vertigo are not diseases).

The present case is distinguishable from the temporary conditions noted above. First, the gallstone was more permanent than high-altitude sickness, which arose suddenly because of the altitude. In this case, the gallstone was present in Mrs. Miller for almost two years. Second, the cause of the ailment in *Paulissen* was "exposure to high altitudes," a non-organic cause. In the present case, the gallstone developed through the internal organic functioning of the body. Finally, unlike the high-altitude disorder, the gallstone would not go away by simply moving from one altitude to another.

The *Paulissen* court distinguishes its decision from the facts in a California district court case. In the California case, a man who had had a kidney removed for renal cancer developed high blood pressure and hypertension as a result of the removal. *Khatchatrian v. Cont'l Cas. Co.,* 198 F.Supp.2d 1157 (C.D.Cal.2002). The combination of cancer, high blood pressure, and hypertension caused him to have a fatal stroke. *Id.* at 1164. The California district court ruled that "no jury acting rationally could conclude that the insured's death falls outside the 'sickness or disease' exclusion of the policy, because high blood pressure, severe hypertension and renal cancer each meet the definition of 'disease.'" *Id.*

The present case is more like the underlying conditions in *Khatchatrian* than the temporary condition in *Paulissen.* The death in *Khatchatrian* was caused solely by the underlying conditions of high blood pressure, severe hypertension, and renal cancer. Those factors would have caused the death regardless of external circumstances. In the present case, the death of Mrs. Miller was caused by an underlying condition, as well as the medical treatment that she received the day prior to her death. The autopsy report demonstrates that the medical treatment contributed to Mrs. Miller's death, without causing the underlying or immediate causes of death.

In conclusion, common sense deems "sickness or disease" to encompass gallstones, other courts have referred to gallstones as a disease, and the case Plaintiff cites is distinguishable. For these reasons, the Court holds that gallstones are included in the ordinary and popular understanding of "sickness or disease."

Although the policy denies recovery when loss results from a "sickness or disease," the contract allows recovery for "a pus-forming infection which occurs through an accidental wound." Plaintiff argues that Mrs. Miller's death was caused by a pus-forming infection, and hence the exclusion should not apply to his claim, regardless of the court's determination that gallstones are a "sickness or disease."

■ Plaintiff contends that Mrs. Miller died from a pus-forming infection. Mrs.

Miller's death was caused by peritonitis. Plaintiff also notes that the autopsy report says, "There is an accumulation of purulent material in the abdominal cavity." "Purulent material" refers to pus. Thus, plaintiff argues that since pus was found in the abdominal cavity, this pus must be the peritonitis. Nothing in the administrative record, however, supports this claim. Peritonitis is not defined as the presence of pus in the abdominal cavity. Plaintiff's argument is thus an assertion that since pus was present, the peritonitis was caused by a pus-forming infection.

Plaintiff also argues that the infection was caused by the surgical treatment, asserting that "the surgical injury inflicted during the ERCP caused the leakage of the contents of the pancreas into the peritoneum, causing the formation of pus ('purulent material'), which is peritonitis." Pl. Br. at 18. Plaintiff thus seeks to establish a causal chain from the surgery to the death by peritonitis.

The autopsy report in the administrative record breaks this causal chain. The autopsy report clearly states that the ERCP was a "significant condition[ ] contributing to death but *not resulting in the underlying cause* [i.e. acute pancreatitis]." (A.R. at 134) (emphasis added). The acute pancreatitis caused the peritonitis, the immediate cause of death. (A.R. at 134). Therefore, the ERCP did not cause the peritonitis, contrary to Plaintiff's assertions. Since the ERCP did not cause the peritonitis, even if the Court assumes that Mrs. Miller died from a pus-forming infection, no connection exists between the pus-forming infection and an accidental cause, i.e., the alleged medical malpractice.

Furthermore, to obtain coverage under the exception for pus-forming infections, the infection must "occur[ ] through an *accidental* wound." (emphasis added). As discussed above, surgical mishaps are not considered accidents under policies such as the one at issue here. So, even if Plaintiff could show that the peritonitis was caused by the ERCP, the loss in this case was caused by a non-accidental wound.

Therefore, because Plaintiff has not shown that the pus in the abdominal cavity caused Mrs. Miller's injuries, nor that the peritonitis was causally connected to the surgery, and because the surgery does not qualify as an "accident" under the policy, the injury does not fall within the pus-forming infection exception.

### 2. The "Medical or Surgical Treatment" Exclusion

■ The second exclusion under the policy is for "medical or surgical treatment of a sickness or disease." Assuming again that Plaintiff could show that the injury was from an "accident," Plaintiff's claim would be denied under this second exclusion. Defendant avers that Plaintiff's claim falls under the second exclusion and points to three cases for support. In the first, a patient died after a pharmacist gave him the wrong heart medication prescription. *Swisher–Sherman*, 1994 WL 562050, 1994 U.S.App. LEXIS 28768. The patient's accidental death insurance policy excluded benefits if the death "directly or indirectly results from: ... Bodily or mental infirmity, disease of any kind, or medical or surgical treatment for any such infirmity or disease." *Id.*, 1994 WL 562050, at *1, 1994 U.S.App. LEXIS 28768, at *2–3. The court denied benefits under the plan, since the "pharmacist's role ... was to implement the medical treatment [the patient] received in the form of a prescription." Id., 1994 WL 562050, at *1, 1994 U.S.App. LEXIS 28768, at *2–3.

In the second case cited by Defendant, a patient was given the wrong solution to drink in preparation for a colonoscopy, and died as a result. *Pickard*, 663 F.Supp.

126. The patient's accidental death insurance excluded benefits "if the individual's loss shall directly or wholly result from: . . . (c) bodily or mental infirmity, disease of any kind, or as a result of medical or surgical treatment therefor." *Id.* The court held that the death occurred as part of the treatment for ulcerative colitis, saying that the solution "was given [to the patient] in preparation for a diagnostic procedure undertaken as part of his treatment and . . . he was told to drink it by a medical person." *Id.* at 127.

Finally, Defendant cites a Michigan state case in which a diabetic woman died a day after undergoing a colonoscopy. *Green,* 2002 WL 31117041, 2002 Mich.App. LEXIS 1342. The doctor failed to inform her to alter her insulin intake before and after the surgery. She died as a result of hypoglycemia from continuing her normal doses of insulin. The patient's insurance policy said, "The Injury [causing death] must not be caused by or contributed to by Sickness, Illness or Disease." *Id.,* 2002 WL 31117041, at *1, 2002 Mich. App. LEXIS at *2. Moreover, the insurer stated, "We will not pay a benefit for a loss which is caused by, results from, or [is] contributed to by . . . Sickness or its medical or surgical treatment, including diagnosis[.]" *Id.* 2002 WL 31117041, at *1, 2002 Mich. App. LEXIS at *2 at *2. Considering the evidence in the light most favorable to the patient, the court held that benefits were properly denied since "the exclusion concerning 'sickness or its medical or surgical treatment, including diagnosis' applies in these circumstances." *Id.* 2002 WL 31117041, at *1, 2002 Mich. App. LEXIS at *8. Thus, benefits were excluded when the patient died from complications with medical treatment a day after the surgery.

The first two cases indicate that Sixth Circuit courts apply medical or surgical treatment clauses to situations outside of the actual operating room. In *Swisher–Sherman,* the medical treatment included the dispensing of prescription drugs at a pharmacy; in *Pickard,* the medical treatment included the ingestion of a solution prior to an actual operation. Hence, both these cases are distinguishable from the present case, in which the patient died from negligence during an operation. Since both those cases include acts outside of the operating room in the term "medical treatment," *a fortiori* the ERCP operation inside the operating room constitutes "medical treatment." Like the patient in *Green,* Mrs. Miller died a day after surgery from subsequent complications, namely peritonitis. Supposing that surgical error caused the peritonitis, the cases above demonstrate that medical malpractice does not prevent the application of an exclusion for medical or surgical treatment. Since plaintiff alleges that the complications in the present case arose directly from surgical error, the exclusion for medical or surgical treatment applies, and his claim fails.

Other jurisdictions similarly consider medical malpractice to be within the meaning of "medical or surgical treatment." One commentator says that "a large number of cases have found that injuries as a result of malpractice are in fact within the [exclusion for recovery when loss occurs due to "medical or surgical treatment"], with the courts often relying on the clear language of the policy, or reasoning that to exclude malpractice [from the meaning of "medical or surgical treatment"] would render the clause meaningless." Jay M. Zitter, *What Constitutes Medical or Surgical Treatment, or the Like, Within Exclusionary Clause of Accident Policy or Accidental–Death Feature of Life Policy,* 56 A.L.R.5th 471. *See, e.g., Hammer v. Lumberman's Mut. Cas. Co.,* 214 Conn. 573, 573 A.2d 699 (1990)

(holding that an exclusion for medical or surgical treatment applied where a plaintiff suffered total disability after being connected to a nutrition line); *Krane v. Aetna Life Ins. Co.*, 698 F.Supp. 220 (D.Colo.1988) (holding that an exclusion for medical or surgical treatment applied where an insured died under general anesthesia during parathyroid surgery, even if the court assumed malpractice); *Castorena v. Colonial Life & Accident Ins. Co.*, 107 N.M. 460, 760 P.2d 152 (1988) (holding that an exclusion for medical or surgical treatment applied where an insured's arm was amputated due to an improper IV injection); *Reid v. Aetna Life Ins. Co.*, 440 F.Supp. 1182 (S.D.Ill.1977) (holding that exclusion for medical or surgical treatment applied where the insured was given the wrong IV solution and died as a result). *But see Mayfield v. Metro. Life Ins. Co.*, 585 S.W.2d 163 (Mo.Ct.App.1979) (holding that an exclusion for medical or surgical treatment did not apply where a patient fell into a coma after a breathing tube dislodged, since the loss of oxygen did not result from treatment but from the cessation of treatment).[2]

Therefore, the exclusion for "medical or surgical treatment" bars plaintiff from recovery under the policy.

## V. CONCLUSION

**ACCORDINGLY, IT IS HEREBY ORDERED** that Plaintiff's motion for judgment on the administrative record [docket entry 8] is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's motion for judgment on the administrative record [docket entry 9] is

**GRANTED** and this case is hereby **DISMISSED WITH PREJUDICE.**

**SO ORDERED.**

---

2. *Mayfield* is distinguishable. In *Mayfield,* the patient died because the breathing tube came loose, and thus the medical treatment ceased. In the present case, the insured died not because treatment ceased; instead, the insured died either from complications of medical treatment or from medical malpractice, according to plaintiff's allegations.