Cathy **RAYMOND,** as Beneficiary of a Policy Issued to Don Raymond, Plaintiff

v.

**LIFE INSURANCE COMPANY OF NORTH AMERICA,** a Foreign Corporation, Defendant.

Case No. 10–20005–CIV.

United States District Court, S.D. Florida, Miami Division.

Oct. 20, 2010.

Richard B. Burke, Miami, FL, Martin Eric Leach, Feiler & Leach, Coral Gables, FL, for Plaintiff.

Sherril May Colombo, Wilson Elser Moskowitz Edelman & Dicker LLP, Miami, FL, for Defendant.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

ADALBERTO JORDAN, District Judge.

This case involves a dispute concerning accidental death benefits under a group policy governed by ERISA, 29 U.S.C. §§ 1001 et seq. Following oral argument, and for the reasons stated below, Life Insurance Company of North America's motion for summary judgment [D.E. 21] is GRANTED, and Cathy Raymond's motion for summary judgment [D.E. 23] is DENIED.

### I. FACTS

Don Raymond was employed by Kellogg Company as a truck driver. Kellogg provided its employees with an employee benefit welfare plan that included group basic life and accidental death benefits issued by Life Insurance Company of North America. LINA (through Cigna Group Insurance) is the claim administrator for the group accident policy. It is undisputed that LINA has discretion to interpret the terms of the policy and to determine eligibility for benefits. *See* Adm. Record [D.E. 24–1 to 24–6] at 288.

### A. MR. RAYMOND'S DEATH

On March 17, 2008, at around 6 a.m., Cathy Raymond noticed that her husband, Don, was not breathing well. She called paramedics, who observed that Mr. Raymond was suffering from cardiac arrest and transported him to the hospital. Mrs. Raymond told the paramedics that Mr. Raymond had "taken a handful of pills" at approximately 4 a.m. Mr. Raymond was admitted to the intensive care unit, treated for cardiac arrest, and placed on a ventila-

tor. Unfortunately, he died the following day.

The medical examiner's report identified the cause of death as "Polydrug Toxicity (Benzodiazepines, Opiates)." *See* Adm. Record at 92. The death certificate listed the same cause of death, and indicated that the manner of death was an "accident." *See id.* at 43.

Dr. Scott Denton, a forensic pathologist, prepared a report for LINA on the cause of Mr. Raymond's death. He concluded that death resulted from "anoxic encephalopathy from accidental intoxication from opiates and benzodiazepines." He also noted that, "[a]t the time of his death in March of 2008, according to the medical records, no opiate medications were prescribed for his ankle injury, and benzodiazepines [i.e., Ambien] were being prescribed for insomnia." *See id.* at 46.

Four years prior to his death, Mr. Raymond had suffered an ankle injury at work. He was diagnosed with ankle inflammation, chronic pain syndrome, and insomnia. Mr. Raymond was prescribed oxycodone and Ambien to address the pain and related conditions caused by and related to the ankle injury. He was given a prescription for both medications to address residual ankle pain and related conditions as recently as November of 2007, and he refilled the prescriptions in December of 2007. At the time of his death, in March of 2008, Mr. Raymond had a current prescription for Ambien, but did not have a current prescription for oxycodone. Mr. Raymond had sought treatment for an addiction to oxycodone in April of 2007 and, in his words, was trying "to get off hydrocodone." *See id.* at 197.

LINA paid Mrs. Raymond $56,000 in basic life insurance benefits under the policy, but denied her claim for an additional $111,000 in accidental death benefits.

## B. The Relevant Policy Provisions & Lina's Denial

In relevant part, the LINA group accident policy pays accidental death benefits where a death results from an accident, defined as a "sudden, unforeseeable, external event that results, directly and independently of all other causes," is "not contributed to by disease, [s]ickness, mental or bodily infirmity," and also "is not otherwise excludable under the terms of the Policy." *See* Adm. Record at 281. The policy contains an exclusion for an accident which "directly or indirectly, in whole or in part, is caused or results from" a "[s]ickness, disease, bodily or mental infirmity or medical or surgical treatment thereof. . . ." *See id.* at 286. "Sickness" is defined as a "physical or mental illness." *See id.* at 282.

In denying Ms. Raymond's claim for accidental death benefits, LINA found that Mr. Raymond's death resulted from accidental ingestion of excessive prescription medications (i.e., oxycodone (an opiate) and Ambien (a benzodiazepine)). It reasoned that the death was not a "covered loss" because these prescriptions "would be considered medical treatment for a sickness, disease, bodily, or mental infirmity, which would include chronic pain and insomnia." Mrs. Raymond contests this decision and argues that her husband's death is a "covered loss."

## II. Summary Judgment Standard

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. *See Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. That is, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). The court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *See Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1285 (11th Cir.1997). It must also "resolve all reasonable doubts about the facts in favor of the nonmovant." *See United of Omaha Life Ins. v. Sun Life Ins. Co.,* 894 F.2d 1555, 1558 (11th Cir. 1990).

## III. Discussion

■ In an ERISA case like this one, in which the plan at issue confers on the administrator of the plan discretionary authority to determine eligibility for benefits, "a deferential standard of review is appropriate." *See Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 2348, 171 L.Ed.2d 299 (2008). The administrator's decision will be upheld unless it is arbitrary and capricious, i.e., unless it lacks a "reasonable basis." *See, e.g., Jett v. Blue Cross Blue Shield of Alabama, Inc.,* 890 F.2d 1137, 1140 (11th Cir.1989). The arbitrary and capricious standard applies to both factual findings and plan interpretations. *See Paramore v. Delta Air Lines, Inc.,* 129 F.3d 1446, 1449 (11th Cir. 1997).

■ The Eleventh Circuit has developed a six-step analysis to review an ERISA administrator's benefits decision:

(1) Apply a *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he *was* vested with discretion in reviewing the claims, then determine whether "reasonable" grounds supported it (hence, review his discretion under the more deferential arbitrary and capricious standard).

(4) If no reasonable ground exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352, 1356 (11th Cir.2008) (internal citations omitted). The Supreme Court's decision in Glenn, however, has modified the sixth step of this analysis. *See Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195–96 (11th Cir.2010). Instead of applying "heightened arbitrary and capricious review" to a conflicted administrator's decision, "the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." *See id.* (citation omitted); *Doyle*, 542 F.3d at 1360.

 Where the arbitrary and capricious standard applies, a court's review is limited to the information contained in the administrative record. *See, e.g., Townsend v. Delta Family–Care Disability and Survivorship Plan*, 295 Fed.Appx. 971, 976 (11th Cir.2008); *Turner v. Delta Family–Care Disability and Survivorship Plan*, 291 F.3d 1270, 1273 (11th Cir.2002). "[I]f the insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer generally must prove the exclusion prevents coverage." *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir.1998).

## A. LANGUAGE OF THE MEDICAL TREATMENT EXCLUSION

 Federal common law generally applies to the interpretation of policy language under ERISA. *See generally Kane v. Aetna Life Ins.*, 893 F.2d 1283, 1285 (11th Cir.1990). "[A]s a general matter, unambiguous language in an ERISA plan must be interpreted and enforced in accordance with its plain meaning." *Perreca v. Gluck*, 295 F.3d 215, 223 (2nd Cir.2002) (citation omitted). Applying de novo review at the first stage of the analysis, I conclude that LINA properly denied accidental death benefits to Mrs. Raymond.

The policy here contains a broad exclusion for an accidental death that is "directly or indirectly, in whole or in part, is caused or results from" a "[s]ickness, disease, bodily or mental infirmity or medical or surgical treatment thereof...." The policy defines "sickness" as a "physical or mental illness."

It is undisputed that Mr. Raymond's death was caused by accidental poisoning (i.e., polydrug toxicity) from the combination of Ambien and oxycodone. It is also undisputed that, at the time of the accident, Mr. Raymond had been diagnosed with insomnia and was being prescribed Ambien for that condition. *See* Adm. Record at 46, 149. Under the terms of the

policy, Mr. Raymond's prescription for Ambien was a medical treatment for a "sickness, disease, bodily or mental infirmity"—his insomnia and/or chronic ankle pain. *See United States v. Carroll*, 518 F.2d 187, 190 (6th Cir.1975) (McAllister, J., dissenting) ("Insomnia is a 'subjective' illness" that causes "great distress" and "is medically described as 'inability to sleep, abnormal wakefulness.'"); Stedman's Medical Dictionary at 204860 (27th ed. 2000) (defining insomnia as "[i]nability to sleep, in the absence of external impediments, such as noise, a bright light, etc., during the period when sleep should normally occur"). *See also Miller v. Hartford Life Ins. Co.*, 348 F.Supp.2d 815, 821 (E.D.Mich.2004) (defining disease as "[a] deviation from the healthy and normal functioning of the body") (citation omitted); Black's Law Dictionary 480 (7th ed. 1999) (same). In addition, there is no dispute that Mr. Raymond's death was caused "in part" by Ambien, because it was the combination of Ambien and oxycodone that was toxic and led to Mr. Raymond's death. Thus, Mr. Raymond's death was caused "directly or indirectly, in whole or *in part*" by a "[s]ickness, disease, bodily or mental infirmity, ... or *medical or surgical treatment thereof*" (emphasis added).

■ The little case law that exists supports this straightforward interpretation of the policy language. As one court has explained, medical treatment of a condition "includes death caused by accidentally overdosing on a drug prescribed by a doctor for a medical condition." *See Grobe v. Vantage Credit Union*, 679 F.Supp.2d 1020, 1031–32 (E.D.Mo.2010), citing *Barkerding v. Aetna Life Ins. Co.*, 82 F.2d 358, 358 (5th Cir.1936) ("Medical and surgical treatment mean what is done by a physician in diagnosing a bodily ailment and seeking to alleviate or cure it. It includes the things done by the patient to carry out specific directions given for these ends by

a physician."). Thus, a patient's or doctor's mistake in the administration of drugs medically prescribed to treat a condition or illness is not a "covered loss" in an accidental death policy that contains an exclusion for treatment of a medical illness. *See, e.g., Kendel v. Zurich Am. Ins. Co.*, 2009 WL 3063363, at *4–5 (E.D.Ark. 2009) (no coverage where administration of drug to patient was undergoing surgery was "in error" and caused death because patient undergoing medical treatment at the time); *Reid v. Aetna Life Ins. Co.*, 440 F.Supp. 1182, 1183 (S.D.Ill.1977) (no coverage where patient was administered poison instead of saline solution, causing his death), *sum. aff'd*, 588 F.2d 835 (7th Cir. 1978). Moreover, the "medical treatment" exclusion has been repeatedly held to apply where an accidental "mishap in the course of treatment" causes death because "the normal understanding" is that "injuries caused not by the illness itself but by the treatment of the illness" are not covered accidents. *See Senkier v. Hartford Life & Acc. Ins. Co.*, 948 F.2d 1050, 1052–54 (7th Cir.1991) (no coverage where misplaced catheter nicked heart of patient suffering from Crohn's Disease, causing death); *Anderson–Tully Co. v. Pan Am. Life Ins. Co.*, 1997 WL 359079, at *1 (6th Cir.1997) (no coverage where patient fell from hospital bed, dislodging arterial sheath and causing death); *Whetsell v. Mutual Life Ins. Co. of N.Y.*, 669 F.2d 955, 957 (4th Cir.1982) (no coverage where death was caused by accidental use of contaminated IV to administer antibiotics).

Had Mr. Raymond not been prescribed Ambien for his diagnosed insomnia (or other illness or sickness), and instead been simply self-medicating with *both* oxycodone and Ambien without any prescription, the medical treatment exclusion may not have applied. In such a case, Mr. Raymond's use and ingestion of drugs that were not prescribed by a doctor would not be part of authorized medical treatment.

*See Wood v. Valley Forge Life Ins. Co.,* 478 F.3d 941, 943, 945 (8th Cir.2007) (drug and alcohol dependence not a "disease" that contributed to decedent's drug and alcohol overdose within meaning of accidental death policy). *Cf. Santaella v. Metropolitan Life Ins. Co.,* 123 F.3d 456, 464 (7th Cir.1997) (holding, but without discussing any medical treatment exclusion, that accidental death coverage existed for overdose where decedent frequently took prescription medications and abused drugs because there was no evidence that decedent intended death to result). But those are not the facts here. Mr. Raymond was taking Ambien pursuant to a medical prescription for his insomnia, and the Ambien in part caused his death when it combined with the oxycodone to create the deadly polydrug toxicity. Thus, there is no coverage. *See Barkerding,* 82 F.2d at 358 ("The excess of heat is like an overdose of a prescribed drug ignorantly taken by a patient, the effect of which is held to be the result of medical treatment under policies such as this one.").

### B. Mrs. Raymond's Reliance on *Dixon*

Mrs. Raymond asserts that her husband's death is a "covered accident" under *Dixon v. Life Ins. Co. of N. Am.,* 389 F.3d 1179, 1184 (11th Cir.2004), because his ankle injury did not "substantially contribute" to his death. In my view, *Dixon* does not help Ms. Raymond. The Eleventh Circuit held in *Dixon* that the language in an accidental death policy that defined a "covered loss" as a death arising "directly [from an accident] and from no other causes" allowed for coverage where a preexisting medical condition played a role in the death, but did not "substantially contribute" to the death. *See id.* Although the policy here contains a similar definition of a covered accident, *Dixon* is not applicable. LINA maintains that there is no coverage because of the medical treatment exclusion, and *Dixon* did not address a medical treatment exclusion like the one here.[1]

### C. Whether the Medical Treatment Exclusion Applies to Treatment for a Work-Related Accident

Mrs. Raymond also argues the medical treatment exclusion does not apply because Mr. Raymond was prescribed Ambien and oxycodone to address chronic pain caused by a work-related accident or injury. In *Grobe,* the district court stated in dicta that a medical treatment exclusion that precluded coverage when death resulted from medical treatment of a "sickness or disease" would not apply if the decedent died from "pain medication for an injury caused by an accident." *See Grobe,* 679 F.Supp.2d at 1033.[2]

■ There are several reasons for not following the *Grobe* dicta here. First, the administrative record is far from clear about the source of Mr. Raymond's insomnia, i.e., whether the insomnia was caused by his ankle pain, or had another cause (such as Mr. Raymond's diagnosed depression and anxiety). *See* Adm. Record at 198–200.[3] Mr. Raymond was diagnosed

---

1. Similarly, *Smith v. Continental Cas. Co.,* 616 F.Supp.2d 1286, 1297 (N.D.Ga.2007), interpreted the definition of the term "accident," but did not address the application of a medical treatment exclusion.

2. Mrs. Raymond does not cite any cases other than *Grobe,* nor could I locate any. I also note that the medical treatment exclusion is broader here than in *Grobe,* and precludes coverage where death results from medical treatment of a "sickness, disease, bodily or mental infirmity."

3. I do not consider Mrs. Raymond's declaration because it was not part of the administrative record. Where the ERISA administrator's decision is subject only to arbitrary and capricious review, "evidence outside of the administrative record cannot be used to reverse an ERISA plan administrator's denial decision." *See, e.g., Menard v. Hartford Life*

with "insomnia," along with "chronic pain syndrome," as well as other ailments—including hypertension—at several physical examinations in the two years preceding his death. Significantly, the medical records do not note any connection between the ankle pain and the insomnia. *See id.* at 149–160. Second, even if the insomnia were causally related to the ankle injury, it was not arbitrary and capricious for LINA to determine that insomnia induced by chronic ankle pain four years after an accident is a "sickness, disease, bodily or mental infirmity" within the medical treatment exclusion given the meanings of the terms "disease," "infirmity" and "sickness" discussed earlier. Third, Mrs. Raymond fails to cite any cases actually holding that medical treatment for a persistent condition caused by a prior work-related accident does not come within the scope of a medical treatment exclusion like the one here.

### D. LINA'S CONFLICT OF INTEREST

■ LINA was vested with discretion to review claims and determine eligibility for benefits. Although it has a "conflict of interest" because it both determines eligibility and pays claims, *see Doyle*, 542 F.3d at 1356, Mrs. Raymond has presented no evidence that this conflict tainted LINA's decision to deny benefits. Thus, LINA's conflict of interest has little weight in evaluating whether the decision was arbitrary and capricious. *See Capone*, 592 F.3d at 1195. Taking the conflict into account under Glenn, I still conclude that LINA properly denied accidental death benefits under a de novo standard and that, at the

very least, its denial was not arbitrary and capricious.

### IV. CONCLUSION

LINA's decision was de novo correct. Alternatively, LINA's denial of accidental death benefits was reasonable, and therefore, not arbitrary and capricious (even taking the conflict of interest into account). Accordingly, LINA's motion for summary judgment [D.E. 21] is GRANTED, and Mrs. Raymond's motion for summary judgment [D.E. 23] is DENIED. Final judgment will be entered by separate order.

---

*and Acc. Ins. Co.*, 260 Fed.Appx. 205, 205 (11th Cir.2007), citing *Jett*, 890 F.2d at 1139–40. Even if I were to consider the declaration, Mrs. Raymond's testimony that her "husband's ankle problem had resolved to the point that he was back to work full-time" and took "prescription pain medication" for residual pain does not show that the Ambien was prescribed only to address the residual ankle pain or that the insomnia was a result of the ankle injury. Just as importantly, the Ambien was prescribed by a doctor to treat one of Mr. Raymond's medical conditions, so LINA correctly considered it to constitute medical treatment for an illness, disease, or bodily or mental infirmity.