[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 5, 2010
JOHN P. LEY
ACTING CLERK

_____

No. 09-10222

_____

D. C. Docket No. 06-03014-CV-MHS-1

JAMES M. CAPONE,

Plaintiff-Appellant,

versus

AETNA LIFE INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(January 5, 2010)

Before MARCUS, FAY and ANDERSON, Circuit Judges.

FAY, Circuit Judge:

Plaintiff-Appellant James Capone struck his head on the bottom of the ocean

while diving in the Bahamas, paralyzing himself from the neck down. Capone sought benefits under the Accidental Death and Personal Loss provision of his employee health insurance policy administered by Aetna Life Insurance Company (Aetna). Aetna denied Capone's claim for benefits twice, prompting this civil action. The district court granted Aetna's motion for summary judgment, holding that Aetna properly applied the plan's accidental means and alcohol exclusion provisions barring recovery. We disagree, holding that Aetna's investigation was insufficient to support their conclusions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Capone, an Ohio resident, was an employee of Dent Wizard International Inc., (Dent Wizard) a Missouri company and wholly-owned subsidiary of Cox Enterprises, Inc. (Cox), a Georgia corporation. As an employee of Dent Wizard, Capone participated in Cox's Welfare Benefit Plan. The Welfare Benefit Plan is governed by the Employee Retirement Income Security Act, 29 U.S.C. §1001 *et seq*. Although Cox self-funded the majority of the benefits available under the plan, the Accidental Death and Personal Loss benefits were funded through an insurance policy with Aetna. The policy had a choice of law provision, which designated Georgia as the governing jurisdiction.

In April 2004, Capone attended a Dent Wizard employee training and

2

incentive program in the Bahamas. At approximately 3:16 p.m., Capone joined a group of guests jumping and diving from a dock adjacent to the Wyndham Nassau Resort. On his first dive, Capone dove into the ocean without incident. On his second dive, Capone struck his head on the bottom, fracturing his spine and suffering permanent quadriplegia.[1] At 4:20 p.m. Capone was admitted to the Princess Margaret Hospital in Nassau and stabilized.

As part of their admittance procedure, the hospital performed a blood serum test and entered the results at 5:22 p.m.[2] The alcohol in Capone's blood serum measured 243.9 mg/dL, which was later converted to a blood alcohol content (BAC) of 0.244 by Aetna's claims administrator.[3] The next day, Capone was transferred from the Bahamian hospital to Jackson Memorial Hospital in Miami, Florida for further treatment. Both hospitals characterized his injury as a result of diving into shallow water and the Miami hospital labeled the incident as a

---

[1] Paralysis of all four limbs. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1399 (28th ed.)

[2] Blood Serum is blood without platelets. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 211 (28th ed.) Blood serum can be converted to whole blood alcohol content by an average ratio of 1/1.18 (with a dominator range of 1.10 to 1.35). Dominick J. Di Maio & Vincent J.M. Di Maio, Forensic Pathology, 466 (1989).

[3] Using the average denominator of 1.18, Capone's serum alcohol content of 243.9 mg/dL equates to a BAC of 0.207. Even using the highest possible calculation, Capone's BAC measures 0.221, substantially less than the .244 claimed by Aetna. For comparison, a BAC of 0.08 is the legal driving limit in every state.

"+ETOH diving accident"[4] and recorded that Capone "noted a history of alcohol abuse."

Capone sought benefits under the Accidental Death and Personal Loss provision of his employee Welfare Benefits Plan. Dent Wizard submitted Capone's initial claim for benefits to Aetna in June 2004, stating that Capone "dove off pier and broke neck." Aetna received a second claim form describing the injury more specifically as a "diving accident" that "resulted [in] C6-7 fracture with complete C5-6 quadriplegia."

After several requests to Capone, Aetna received his medical records and toxicology report in November 2005. On February 1, 2006, Aetna denied Capone's claim for benefits on two independent grounds. First, Aetna claimed that Capone intentionally exposed himself to unnecessary and foreseeable risks by voluntarily diving from a fifteen to twenty foot high dock into the ocean. Therefore, his injury was not the result of an "accident" as defined by the policy. Aetna based its denial on an accident report from the Wyndham Nassau Resort, and information provided by Alfred Rolle, a security officer for the Wyndham, who indicated that "no diving" signs were posted on the dock and ignored by Capone.

---

[4] ETOH is the chemical abbreviation for ethyl alcohol or ethanol, the medical term for alcohol.

Second, Aetna claimed that even if his injuries were the result of an "accident," no benefits were payable under the policy for accidents "caused or contributed to by the use of alcohol." Aetna cited Capone's medical records and the toxicology report in its denial. Aetna stated that because Capone was intoxicated, he could not recover under his policy.

Appealing Aetna's denial, Capone claimed that jumping from the dock was a common practice. Capone stated that, contrary to Aetna's assertion, "no diving" signs were not posted and a nearby lifeguard did not stop the group from diving. Capone supported his appeal with photographic evidence of the dock and resort area, taken two weeks after his injury.

The photographs showed the dock sitting four to five feet above the water instead of the fifteen to twenty feet claimed by Aetna. The photographs also showed several people jumping off the dock, though no people were diving. "No diving" signs were not visible in the photographs. Depositions of Wyndham employees later revealed that the "no diving" signs had been blown away months earlier and never been replaced. No lifeguard was visible in the photographs.

Addressing the alcohol exclusion, Capone argued that Aetna failed to adequately specify how alcohol contributed to his injury. Capone challenged the accuracy and reliability of the toxicology report due to the hospital's failure to

5

provide calibration testing of its equipment.  Capone also contended that an accurate conversion of his blood serum level put his BAC at 0.18 instead of the 0.244 claimed by Aetna.[5]

Capone further alleged that because the accident occurred at 3:16 p.m., and he had consumed alcohol in the hour immediately preceding the accident, his actual BAC at the time of the accident would have been substantially less than 0.18 due to the delay in alcohol absorption.  Capone cited the same medical treatise used by Aetna to support his argument.  Finally, Capone contended the accident was caused by a sudden change in water depth due to wave action and not his alcohol consumption.

Capone supported his appeal with an eyewitness affidavit signed by Capone's coworker and friend, Kevin Zeh.  Zeh attested that both he and Capone successfully dove from the dock prior to Capone's accident, and that other guests were jumping and diving as well.  Zeh stated that he did not see Capone "acting inappropriately" or having "red eyes, slurred speech, or difficulty walking," immediately preceding the accident.

In a letter dated May 31, 2006, Aetna denied Capone's appeal.  Aetna concluded that a voluntary and intentional dive into the ocean was not an

_____

[5] 0.18 represent the lowest possible BAC within the accepted ratio range for converting the blood serum level to blood alcohol content.

6

accidental means of injury under Georgia law, despite the fact that the resulting injury may have been unexpected. Additionally, Aetna explained that the toxicology results, showing a BAC of 0.244, barred his recovery. Aetna relied on a learned medical treatise, which stated that someone with a BAC of 0.20 to 0.30 would exhibit the following behavior: "staggering, grossly impaired, drunk; may be lethargic and sleepy or hostile and aggressive."[6] Aetna noted that even if Capone's BAC was 0.18 as claimed by his appeal letter, the treatise stated that he would still show signs of "increas[ed] impairment of sensory motor activities, reaction times, attention, visual activity, and judgment."[7] Aetna dismissed Capone's challenge to the reliability of the blood serum test because Capone failed to provide any expert or medical documentation to support his assertions.

Capone filed this action for benefits against Aetna, Cox, and Cox's Welfare Benefits Plan. Capone claimed a wrongful denial of benefits under 29 U.S.C. §1132(a)(1)(B). The district court dismissed all claims and defendants except for the benefits claim against Aetna. In response to Aetna's motion, the district court issued a preliminary order stating that the standard of review for Capone's ERISA benefits claim was this circuit's "heightened arbitrary and capricious standard" because Aetna was a conflicted administrator acting as both evaluator and payor of

---

[6] Dominick J. Di Maio & Vincent J.M. Di Maio, Forensic Pathology, 450 (1989).

[7] Id.

7

claims.

After conducting limited discovery, Capone and Aetna filed cross motions for summary judgment. On *de novo* review, the first step of ERISA's arbitrary and capricious standard, the district court concluded that Aetna's claim decision was correct and granted Aetna's motion for summary judgment. Capone argues that the district court erred by: (1) applying the incorrect standard of review under ERISA in reviewing his claims; (2) denying his claim under Georgia's "accidental means" standard; and (3) applying the insurance plan's alcohol exclusion as an alternative, independent ground for denial.

## II. STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment, applying the same legal standards governing the district court's decision. *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 911 (11th Cir. 2007).

ERISA provides no standard for reviewing decisions of plan administrators or fiduciaries. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109, 109 S. Ct. 948, 953 (1989). However, the Supreme Court in *Firestone* established three distinct standards for reviewing an ERISA plan administrator's decision: (1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and

capricious where the plan grants the administrator discretion;[8] and (3) heightened

arbitrary and capricious where the plan grants the administrator discretion and the

administrator has a conflict of interest. *See Buckley v. Metro. Life*, 115 F.3d 936,

939 (11th Cir.1997). Recent cases from this circuit have expanded the *Firestone*

test into a six-step analysis to guide district courts in reviewing an administrator's

benefits decision:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict, then end the inquiry and affirm the decision.
> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm

---

[8] Cases in our circuit equate the arbitrary and capricious standard with the abuse of discretion standard. *See Jett v. Blue Cross & Blue Shield of Ala. Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989).

or deny it.

*Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004) *overruled on other grounds by Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352 (11th Cir. 2008).

Until recently, the hallmark of the heightened arbitrary and capricious standard was its burden shifting requirement. When a plan administrator had a conflict of interest by both reviewing and paying claims, "the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest." *Brown v. Blue Cross & Blue Shield of Ala. Inc.*, 898 F.2d 1556, 1566 (11th Cir. 1990). However, in *Metropolitan Life Ins. Co. v. Glenn*, the Supreme Court called into question the Eleventh Circuit's heightened arbitrary and capricious standard. 128 S. Ct. 2343, 2351 (2008). *Glenn* dealt with the denial of benefits under an employee benefit plan governed by ERISA. *Glenn* agreed that the appropriate standard for reviewing a conflicted administrator's decision was arbitrary and capricious, but held that an individualized inquiry is required to determine the circumstances of each decision. *Id*. As such, a generalized test is inappropriate. *Id.*

In *Doyle*, this circuit recognized that *Glenn* implicitly overrules *Brown* and other cases requiring courts to apply the heightened standard to a conflicted

10

administrator's benefits decision. 542 F.3d at 1359. Instead, "the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Id*. at 1360. Furthermore, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Id*.

The parties dispute the impact of *Doyle* on the six-step methodology set forth in *Williams*. However, the district court found and we agree that the *Williams* methodology remains intact except for the sixth step. In *Doyle* itself, this circuit approved the district court's use of the *Williams* methodology, as modified by *Glenn*. *See also White v. Coca Cola Co*., 542 F.3d 848, 854 (11th Cir. 2008) ("Although *Glenn* affects the sixth step of *Williams*, *Glenn* does not alter our analysis unless Coca-Cola operated under a conflict of interest"). Therefore, we will apply the *Williams* methodology as modified by *Glenn*. This requires the court to first determine whether Aetna's denial of benefits was *de novo* wrong.

## III.  DISCUSSION

A decision is "wrong" if, after a *de novo* review, "the court disagrees with the administrator's decision." *Williams*, 373 F.3d at 1138. We find that Aetna's decision to deny benefits was *de novo* wrong.

11

**A. STANDARD OF REVIEW**

The district court ruled that the heightened arbitrary and capricious standard was the appropriate standard to review the administrator's decision. Despite this ruling, the district court ordered that the scope of discovery was not limited to the administrative record compiled by Aetna insofar as additional discovery could shed light on "how the fiduciary reached its decision," or in examining "whether an administrator fulfilled his or her fiduciary duties." This expansive discovery falls in line with a *de novo* review. Also, the district court ultimately rendered its decision solely on *de novo* grounds. As our circuit's ERISA standard of review incorporates the *de novo* inquiry as the first step in the arbitrary and capricious standard, it is unnecessary for us to go beyond a *de novo* review at this time. *See* U.S.C.A. § 2111 (2008) ("On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect substantial rights of the parties").

**B. CHOICE OF LAW**

Capone contends that allowing Georgia law to apply would frustrate the twin goals of ERISA: protecting employee interests and providing uniformity of benefits administration. "The pertinent question is whether the principles of liability agreed upon by the parties are inconsistent with the language of ERISA or

the policies that inform that statute and animate the common law of the statute."

*Buce v. Allianz Life Ins. Co.*, 247 F.3d 1133, 1148 (11th Cir. 2001). In *Buce,* we recognized that ERISA's preemptive authority sweeps broadly but concluded that there was no evidence in the statutory language or common law of ERISA suggesting that a valid choice of law provision would be subversive to ERISA policy. *See id.*

Capone further argues that it is fundamentally unfair to apply a Georgia choice of law provision to a claim filed by an Ohio Citizen, who worked for a Missouri company and was injured in the Bahamas. "Where a choice of law is made by an ERISA contract, it should be followed, if not unreasonable or fundamentally unfair." *Id*. at 1149.

While we recognize Capone's argument, the policy was contracted with a Georgia corporation, contained a valid choice of law provision designating the state of delivery as the governing jurisdiction and was properly delivered in Georgia. While confronting a similar argument in *Buce*, we held that although the doctrine of "accidental means" may no longer be fashionable, its use under Georgia law "can hardly be characterized as 'unreasonable,' let alone 'fundamentally unfair.'" *Id.* As such, we conclude that Georgia law applies to Capone's claim.

13

**C. ACCIDENTAL RESULTS V. ACCIDENTAL MEANS**

Georgia law distinguishes between insurance coverage for accidental results and coverage for injuries caused by accidental means. *See Provident Life & Accident Ins. v. Hallum*, 576 S.E.2d 849, 851 (Ga. 2003). In *Hallum*, the Georgia Supreme Court explained that an "accidental result" is an injury that is unexpected but arises from a conscious voluntary act, without any intervening circumstances. *See id*. Conversely, an injury from "accidental means" is one that is the result of an unforeseen act that was involuntarily or unintentionally done. *See id*. The insurance policy has two relevant provisions:

> (1)This plan pays a benefit, if, while insured, a person suffers a bodily injury *caused by an accident*: and if, within 365 days after the accident and as a direct result of the injury, he or she loses:
> - His or her life.
> - A hand, by actual severance at or above the wrist joint.
> - A foot, by actual severance at or above the ankle joint.
> - An eye, involving irrecoverable and complete loss of sight in the eye.
> - His or her speech or hearing, the loss must be total and permanent.
> - The thumb and index finger of the same hand, by actual severance of entire digit. Loss of thumb and index finger means complete severance through or above the metacarpophalangeal joint of both digits.
>   . . .
>
> (2) This plan also pays a benefit if, while insured, a

14

person suffers a bodily injury ***in an accident*** and if, within 30 days after the accident and as a direct result of the injury, he or she is stricken with one of the following forms of paralysis:

- Quadriplegia: the entire and irrecoverable paralysis of both upper and lower limbs.
- Paraplegia: the entire and irrecoverable paralysis of both lower limbs.
- Hemiplegia: the entire and irrecoverable paralysis of the upper and lower limbs on one side of the body.
- Uniplegia: the entire and irrecoverable paralysis of one limb.

(emphasis added). Georgia courts have consistently held the language in the first provision, "caused by an accident," to mandate accidental means. *See Laney v. Continental Insurance Co.*, 757 F.2d 1190, 1192 (11th Cir. 1985). The reasoning deduces that in the phrase "accidental means," the word accidental is an adjective describing the quality of the events precipitating the ultimate result. The focus is on the occurrence or happening which produces the result, not the result itself. *See id.* The distinction is grounded on the idea that "means" is synonymous with "cause;" that the difference between "accidental means" and the other terms is the difference between cause and effect. *See Winters v. Reliance Standard Life Ins. Co.*, 433 S.E.2d 363 (Ga. App. 1993).

There is no settled interpretation for the language in the second provision. While there is no precedent directly on point, Capone points to the language

15

examined in *Hallum*.  576 S.E.2d at 849.  *Hallum* dealt with the phrase "accidental bodily injuries," holding that the phrase mandated an accidental results standard. *Hallum* reasoned that by using "accidental" to modify the cause or means of any injuries, the policy "places the focus of the coverage on the injuries, not the means that caused the injury."  *Id*.

We have serious doubt as to whether the language in the second provision would be controlled by Georgia's accidental means standard.  We believe that the language used closely resembles the language used by the Georgia Supreme Court in *Hallum*.  However, it makes no difference because we hold that under the facts of this case, it appears Capone would qualify under either reading.

## D. ACCIDENTAL MEANS

Generally, for an injury to result from accidental means, it must be the "unexpected result of an unforseen or unexpected act which was involuntarily and unintentionally done."  *Johnson v. Nat. Life, etc. Ins. Co.*, 90 S.E.2d 36, 37 (Ga. App. 1955).  Georgia law is clear that "where an unusual or unexpected result occurs, by reason of the doing of an intentional act, with no mischance, slip or mishap occurring" in the act, the ensuing injury is not caused by accidental means. *See Laney*, 757 F.2d at 1191.  In other words, an accident is never present when a deliberate act is performed, unless some additional, unexpected, independent, and

16

unforeseen happening occurs which produces or brings about the result of injury or death. *See Jackson v. Nat'l Life & Accident Ins. Co.*, 202 S.E.2d 711, 712 (Ga. App. 1973).

However, when something unforeseen occurs in the doing of the act, the death or injury is held to be within the protection of policies insuring against death or injury from accident. *See Commercial Cas. Ins. Co. v. Matthews,* 195 S.E. 887, 892 (Ga. App. 1938). Therefore, in order to recover under an accidental means standard, it is incumbent upon the plaintiff to show that in the carrying out of the act which preceded the injury something "unforeseen, unexpected, or unusual occurred," causing the result to differ from the natural or probable consequence of his voluntary action. *Thompson v. Prudential Ins. Co. of America*, 66 S.E.2d 119, 122 (Ga. App. 1951). Even if Capone's dive was intentional, if there was an intervening unexpected act, Capone would be entitled to recover under his policy.

Other courts around the country have confronted the issue. While we recognize that these courts were not dealing with Georgia law, the law of accidental means is peculiar and we find these courts' reasoning persuasive. In *U.S. Mut. Acc. Ass'n v. Barry,* the Supreme Court held that although the plaintiff voluntarily jumped off a platform, he could still recover under an "accidental means" policy. 131 U.S. 100, 121, 9 S. Ct. 755, 762 (1889). The Court presumed

17

that he intended to land safely like his companions before him and held that his resulting injury was unexpected and therefore constituted an accident under the policy.[9] *See id.* *Barry* reasoned that, if in the carrying out of the act that precedes the death or injury, although an intentional act, something unforeseen, unexpected, and unusual occurs which produces the death or injury, it is accidentally caused or results from accidental means. 131 U.S. at 109, 9 S. Ct. at 759.

In *Knight v. Metropolitan Life Ins. Co.*, the Arizona Supreme Court overturned a trial court's denial of recovery in the case of an experienced diver who dove off the Coolidge Dam, holding that his injury was covered under an accidental means policy because he hit the water differently than he planned. 437 P.2d 416, 421 (Ariz. 1968). The Supreme Court of New Jersey allowed recovery under an accidental means policy after the insured voluntarily jumped off a boat in order to swim to shore. *See Riker v. John Hancock Mut. Life Ins. Co.*, 30 A.2d 42, 43 (N.J. 1943). *Riker* reasoned that even though the plaintiff's actions were intentional, he had "intended to reach the nearby shore in safety." *Id*. at 44.

In the instant case, Capone made the dive once without incident. Other individuals were diving or jumping in a contemporaneous fashion without incident.

---

[9] Following this reasoning, if Capone had intended on making a shallow dive but for some unknown reason landed in the water at a different angle, his injury would have been caused by "accidental means."

The evidence demonstrates that diving from the dock was a common practice. Prior occurrence of similar acts that did not result in injury is a strong indicator of changed conditions. As such, there was most likely some unforeseen or unintended condition or combination of circumstances that contributed to Capone's injury on that particular dive.

Capone bears the burden of proving a *prima facie* case of entitlement to contractual benefits under the policy. *See Con't Assurance Co. v. Rothell,* 181 S.E.2d 283, 285 (Ga. 1971). Capone contends that an unexpected wave created the shallowness that had not otherwise existed. If so, such a wave is a force external to Capone's body that caused or contributed to the unforseen result. The burden then shifts to Aetna to prove that Capone is not entitled to benefits. *See id.*

Aetna's position is that when Capone voluntarily dove into shallow water, the resulting injury was foreseeable, regardless of whether any change in circumstances occurred. As such, Aetna did not conduct a thorough investigation into the events preceding the injury. Aetna failed to investigate the depth of the water at low tide, the depth of the water at high tide and the tidal conditions at the time of the accident.[10] Aetna made no attempt to locate other guests who might

---

[10] Capone, who stands 6'1" tall, testified in his deposition that after his first dive his feet could barely touch the sand, forcing him to walk on his tip toes as he made his way back to the dock.

have been on scene, which could have been done through hotel records.  Capone

showed that Aetna's estimate of the dock's height was clearly erroneous, yet the

record does not reflect any additional action taken by Aetna to review their

decision.  Certainly an injury of this magnitude demands a full and complete

investigation.

Capone is precluded from bringing a breach of fiduciary duty claim in

conjunction with a wrongful denial of benefits claim.  *Katz v. Comprehensive Plan*

*of Group Ins.*, 197 F.3d 1084, 1088 (11th Cir. 1999).  However, Aetna's

responsibilities as a fiduciary illustrates the proper standard of investigation.  29

U.S.C. § 1104(a)(1), mandates that a fiduciary shall "discharge his duties with

respect to a plan solely in the interest of the participants and beneficiaries and . . .

(B) with the care, skill, prudence, and diligence under the circumstances then

prevailing that a prudent man acting in a like capacity and familiar with such

matters would use . . . ."  Consequently, Aetna had the responsibility to fully

investigate Capone's claims before denying benefits.  Aetna failed to adequately

address the issues raised in Capone's appeal and the denial of benefits without a

proper investigation was *de novo* wrong.

## C.  ALCOHOL EXCLUSION

Aetna cites the policy's alcohol exclusion as an independent ground for

20

denial of Capone's claim. The policy provides, in relevant part:

> No benefits are payable for a loss **caused or contributed to by**:
>  . . .
> Use of alcohol, intoxicants, or drugs, except as prescribed by a physician.
>
> An accident in which the blood alcohol level of the operator of a motor vehicle meets or exceeds the level at which intoxication would be presumed under the law of the State where the accident occurred shall be deemed to be caused by the use of alcohol.

(emphasis added). Aetna relied on the toxicology tests over the contradictory affidavit of Kevin Zeh and the statements of Capone himself. They also relied on the accuracy of the screening equipment as Capone presented no evidence beyond the unsubstantiated assertion of improper calibration. Aetna is entitled to value the medical evidence over the affidavits of Zeh and Capone. *See Brown v. Blue Cross and Blue Shield of Ala*., Inc. 898 F.2d 1556, 1572 (11th Cir. 1990) *overruled on other grounds by Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352 (11th Cir. 2008)).

While we agree that it is reasonable to draw the conclusion that Capone was under the influence of alcohol, it is unreasonable to conclude that his intoxication caused his injury. Unlike the motor vehicle provision, there is no mandate in the policy that legal intoxication shall be deemed the cause of the accident. The plain

21

language of the provision is clear that the presence of alcohol does not warrant the presumption of causation outside of the motor vehicle context. Without this presumption, causation is a fact specific inquiry.

Capone has the burden of proving a *prima facie* case of entitlement to contractual benefits under the policy. *See Con't Assurance Co. v. Rothell,* 181 S.E.2d 283, 285 (Ga. 1971). We hold that Capone has met this burden. Capone established that several other individuals were diving from the dock in a contemporaneous fashion. Capone claims they dove irrespective of their consumption of alcohol, and Aetna offers no evidence to refute this claim.

The burden then shifts to Aetna to prove that Capone is not entitled to benefits. *See id*. As a fiduciary, Aetna is required to make a reasoned determination after a diligent investigation. Aetna did not conduct a reasonable investigation sufficient to show that Capone is not entitled to benefits. There was no investigation regarding the series of events leading up to the dive or the intoxication level of the other divers. There may have been some who had consumed no alcohol, yet still chose to dive. Again, this investigation could have been conducted by contacting other guests engaged in this same activity.

Aetna claims that because Capone was intoxicated, his judgment was necessarily impaired. Aetna reasons that since the decision to dive required a

degree of judgment, alcohol necessarily caused or contributed to his injury. This assertion, without more, cannot meet Aetna's burden of proving the exclusion applies.

There is simply not enough in the record to sufficiently connect Capone's decision to dive with his state of intoxication. As such, Aetna has not presented sufficient evidence that suggests that the consumption of alcohol caused or contributed to the accident and resulting injury. Thus, the denial of benefits based upon the alcohol exclusion without more was *de novo* wrong.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is,

REVERSED and the cause REMANDED for further consideration.