[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 7, 2011
JOHN LEY
CLERK

_____

No. 09-11374

_____

D. C. Docket No. 06-01950-CV-T-33-TGW


WAYNE R. GRAY,

                                                            Plaintiff-Appellant,

versus

NOVELL, INC.,
THE SCO GROUP, INC.,
X/OPEN COMPANY LIMITED,

                                                            Defendants-Appellees.


_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 7, 2011)

Before EDMONDSON, HILL and ALARCÓN,* Circuit Judges.

_____

*Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

PER CURIAM:

This case centers on ownership of the UNIX trademark.  Plaintiff-Appellant Wayne R. Gray ("Gray") alleges that the Defendant-Appellees -- X/Open Company Limited ("X/Open"), Novell, Inc. ("Novell"), and The Santa Cruz Operation, Inc. ("SCO")[1] -- conspired to conceal the lawful owner of this mark, that X/Open was <u>not</u> the true owner, and that X/Open's administrative opposition to Gray's registration of the similar-sounding iNUX mark was therefore fraudulent. The District Court granted summary judgment for Defendants, concluding that X/Open was the indisputable owner of the UNIX mark when it opposed Gray's iNUX registration; we affirm the judgment.

## I. <u>Background</u>

### A.  The UNIX Businesses and Trademarks

UNIX is a computer source code developed by American Telephone & Telegraph ("AT&T") in 1969.  AT&T began using the trademark "UNIX" to

---

[1] The Santa Cruz Operation, Inc., was the predecessor-in-interest to the SCO Group, with respect to whom this appeal is currently stayed due to ongoing bankruptcy proceedings.  We refer to both companies as "SCO" herein.

identify operating systems based on this source code in 1972. In 1986, it filed two UNIX trademark registrations with the U.S. Patent and Trademark Office ("PTO"). In 1990, AT&T assigned the UNIX mark and registrations to its subsidiary, UNIX Systems Laboratories ("USL").

USL's UNIX business had two facets: (1) a source-code business, for which USL owned UNIX source code, developed operating systems based on that source code -- most notably UNIX System V -- and licensed the UNIX trademark for products created from UNIX source code; and (2) a product business, in which USL -- along with Novell, its joint-venture partner -- sold a UNIX-based operating system called UNIXWARE.[2]

In 1994, USL merged into Novell. As part of the merger, Novell acquired the UNIX trademark. Novell's post-merger UNIX operations were similar to those of USL: Novell maintained both the source-code business -- under which it owned the UNIX System V source code and the UNIX trademark, and licensed them to third parties -- and the UNIXWARE product business.

The Term Sheet. Shortly before the completion of this merger, Novell and several other companies selling UNIX-based operating systems agreed that it was in the computer industry's best interest to transfer Novell's UNIX-licensing

---

[2] We refer to the trademark associated with the source-code business as "the UNIX trademark," and the trademark associated with the product business as "the UNIXWARE trademark."

business to an independent non-profit organization, which would then be responsible for licensing the UNIX trademark to third parties.  The companies also agreed that this organization would license the UNIX mark not based on products' use of UNIX source code -- this had been the standard in the past -- but instead based on products' conformity to certain compatibility specifications.

The independent organization selected to do this specification-based licensing was X/Open, an international technology consortium based in the United Kingdom.  In October 1993, the companies signed a non-binding agreement, entitled "Term Sheet," declaring that Novell would begin licensing the UNIX mark exclusively through X/Open, and would assign ownership of the mark to X/Open within three years.

The Licensing Agreement.  On 10 May 1994, Novell and X/Open implemented the Term Sheet's first step by executing a Licensing Agreement in which Novell granted X/Open an "exclusive, perpetual, irrevocable license to use, and sub-license to third parties the use of," the UNIX trademark.  In addition, this agreement obligated X/Open to grant sub-licenses to products that conformed to certain specifications, thus creating the specification-based licensing business contemplated in the Term Sheet.

Novell also authorized X/Open to publish the acknowledgment that "UNIX

is a registered trade mark licensed exclusively by X/Open," and committed to assigning the UNIX trademark to X/Open in three years (unless the parties later agreed to a different time). While this agreement gave X/Open responsibility for the portion of Novell's source-code business related to the licensing of UNIX, Novell retained ownership of the System V source code and trademark. Novell also kept the rights to issue maintenance releases and to receive royalties for products licensed prior to the agreement. The Licensing Agreement did not implicate Novell's UNIXWARE business.

The Asset Purchase Agreement. A little over one year later, Novell reached an agreement to sell certain assets, including much of the remainder of its UNIX business, to SCO. Schedule 1.1(a) of the Asset Purchase Agreement ("APA"), which listed the assets being transferred to SCO, transferred "[a]ll rights and ownership of UNIX and UNIXWARE," including -- "without limitation" -- the "[t]rademarks UNIX and UNIXWARE as and to the extent held by [Novell] (excluding any compensation [Novell] receives with respect of the license granted to X/Open regarding the UNIX trademark)." Schedule 1.1(b) listed assets specifically excluded from the transfer, among them "[a]ll copyrights and trademarks, except for the trademarks UNIX and UNIXWARE." In other words, Schedule 1.1(b) confirmed that the UNIX and UNIXWARE trademarks were to be

5

transferred to SCO -- but, as indicated in Schedule 1.1(a), only "as and to the extent held by" Novell.

The Confirmation Agreement.  In September 1996, Novell, X/Open, and SCO jointly executed a tripartite Confirmation Agreement that clarified the fate of the UNIX trademark.  This agreement "provide[d] for the acceleration of the vesting of title in X/Open to the UNIX trademark, and the assignment to SCO of Novell's rights under the [Licensing] Agreement."  To accomplish this, the Confirmation Agreement tasked Novell -- "the owner of legal title to the UNIX trademark" -- with formally transferring title to the UNIX trademark to X/Open "as soon as possible."  The agreement further provided that "such assignment by Novell shall not be considered a breach of Novell's obligations [to SCO] under the APA," and that the APA was "subject to rights and obligations established in" the Licensing Agreement.

A month after executing the Confirmation Agreement, Novell and SCO amended the APA, revising Schedule 1.1(b) -- the list of assets excluded from the transfer -- to exclude "[a]ll copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of the [APA] required for SCO to exercise its rights with respect to the acquisition of UNIX and UNIXWARE technologies."  This amendment reinforced the Confirmation Agreement in making

6

clear that Novell would not transfer to SCO any trademark that SCO did not "require[]" with respect to the assets it was acquiring from Novell.

The Deed of Assignment. In November 1998 Novell finalized its compliance with the earlier agreements by assigning ownership of the UNIX mark to X/Open. Under this Deed of Assignment, Novell assigned "all property, right, title and interest in the [UNIX] trademarks with the business and goodwill attached to the said trademarks." X/Open recorded the assignment with the PTO in June 1999.

## B. The UNIX-iNUX Dispute

The events directly giving rise to this litigation began in 1999, when the Appellant Gray filed an application with the Patent & Trademark Office to register the trademark "iNUX." Gray had incorporated a computer software business in October 1998, initially under the name MegaChoice, Inc. But he later changed the company's name to iNUX, Inc. and applied to register the iNUX mark in April 1999.

This application prompted a response from X/Open, which sent Gray a letter demanding that he abandon his application for the mark. X/Open contended that

7

iNUX was "virtually identical" to X/Open's UNIX trademark. Shortly thereafter, X/Open filed a formal administrative opposition to Gray's application with the Trademark Trial and Appeal Board ("TTAB") of the PTO. In this opposition, X/Open asserted that it owned several UNIX trademark registrations and that the iNUX mark was likely to "cause confusion, mistake, or deception," given its similarity to the "famous" UNIX mark.

Gray responded to X/Open's opposition by launching his own investigation into X/Open and the UNIX mark. Through this investigation, he came to believe that Novell had never transferred ownership of the UNIX mark to X/Open and that X/Open's opposition to the iNUX application was therefore fraudulent. After five years of Gray's investigation and ongoing discovery disputes between him and X/Open, Gray filed this lawsuit against X/Open, Novell, and SCO. He also filed a successful motion to have the TTAB suspend the opposition proceedings.[3]

## C. Procedural History

The basis for Gray's suit was his claim that the three defendants had conspired to conceal the true owner of the UNIX mark. According to Gray, SCO

---

[3] The TTAB proceedings remain unresolved and suspended pending resolution of this lawsuit.

8

-- not X/Open -- was the lawful owner of the mark; and so X/Open had falsely claimed ownership of the mark in its opposition to Gray's iNUX registration. Claiming that the Defendants induced him to abandon his business so that he could defend himself in court, Gray sought treble damages plus interest and attorney's fees -- an amount in excess of $4.5 million -- as well as injunctive relief and cancellation of the UNIX trademark registrations X/Open claimed to own.

The complaint raised eleven distinct claims for relief. These claims relied on the federal and Florida RICO statutes, 18 U.S.C. § 1961 et seq., Fla. Stat. § 895; the Lanham Act, 15 U.S.C. §§ 1120, 1125(a); a federal criminal statute, 18 U.S.C. § 1001; the Florida Communications Fraud Act, Fla Stat. § 817.034; and common law theories of fraud and conspiracy to defraud.

X/Open moved for summary judgment on liability and damages. X/Open argued that no genuine issue of material fact existed, that X/Open was the lawful owner of the UNIX trademark, and that any losses Gray suffered were due to his own decision to abandon his business and pursue this suit. Novell also moved for summary judgment on five of Gray's claims. Novell contended that the claims under the Lanham Act and 18 U.S.C. § 1001 failed because no evidence existed that Novell had fraudulently procured a trademark registration and also contended that the common law claims failed because no evidence existed that Novell had

9

made misrepresentations. Gray filed his own motion for summary judgment, seeking an order either determining the issue of ownership or determining the material facts not genuinely at issue.

The District Court concluded that Novell had granted X/Open an exclusive license for the UNIX mark via the 1994 Licensing Agreement, that Novell transferred ownership of the mark to X/Open via the 1998 Deed of Assignment, and that no fraud was involved in either X/Open's registration of its ownership of the UNIX mark with the PTO or its opposition to Gray's iNUX registration. The District Court thus granted X/Open and Novell's motions for summary judgment, and the Court denied Gray's motion. Gray now appeals.

## II. Standard of Review

We review a district court's summary judgment decision de novo, applying the same legal standards as those that governed the district court. Capone v. Aetna Life Ins. Co., 592 F.3d 1189, 1194 (11th Cir. 2010) (citation omitted). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We construe all facts and draw all reasonable inferences in favor of the non-

moving party.  Abel v. S. Shuttle Servs., Inc., 620 F.3d 1272, 1273 n.1 (11th Cir. 2010) (citation omitted).

## III.  Discussion

The linchpin of Gray's complaint is his allegation that X/Open is not the true owner of the UNIX mark.  He claims that Novell did not grant X/Open an exclusive license to the UNIX mark.  According to Gray, Novell instead transferred ownership of this mark to SCO via the APA; and ever since, the three Defendants -- X/Open, Novell, and SCO -- have conspired to conceal the mark's true owner.  If Gray is mistaken about the ownership of the UNIX mark, all of his claims must fail; nothing would be fraudulent in X/Open representing itself as the UNIX mark's owner, nor would there be fraud attributable to Novell or SCO. Gray is mistaken.  Beginning with the Licensing Agreement, Gray is incorrect about the legal effect of each transaction at issue.  We begin our analysis with the Licensing Agreement.  Gray has not shown why this agreement did not mean what it said when it described the license X/Open received as "exclusive."  He argues that this designation is not conclusive and that a licensee must receive "all substantial rights" to intellectual property to become an exclusive licensee, but he

11

has failed to show any such right that X/Open did not receive in the Licensing Agreement.

Through this agreement, Novell charged X/Open with certain responsibilities on the future sublicensing of the UNIX mark and authorized X/Open to publicize that it was the exclusive licensor of this mark. Novell did retain certain rights in the Licensing Agreement -- for example, the right to use the UNIX name within the UNIXWARE designation that Novell continued to own -- but Gray has not shown that these retained rights are inconsistent with the granting of an exclusive license to X/Open.[4] No genuine issue exists on the effect of the Licensing Agreement: Novell made X/Open the exclusive licensee of the UNIX trademark.

Gray is similarly mistaken about the Asset Purchase Agreement executed by Novell and SCO. While it is true that the APA provided for the transfer of UNIX and UNIXWARE to SCO "without limitation," it expressly transferred ownership of the corresponding trademarks only "as and to the extent held by" Novell. Here

---

[4] Gray notes that Novell filed formal oppositions to at least three trademark registrations in the PTO after executing the Licensing Agreement. He claims that Novell therefore must have retained the obligation to enforce its rights in the UNIX trademark. But even after licensing the UNIX mark to X/Open, Novell remained in the UNIX business. So Novell had an interest in protecting the mark's integrity. Standing to file a formal opposition requires only that one "believe[] that he would be damaged by the registration of a mark upon the principal register." 15 U.S.C. § 1063(a). Novell was not required to own the UNIX mark to file oppositions, and the filing of such oppositions is entirely consistent with its exclusive licensing of the UNIX mark to X/Open.

12

the distinction between Novell's two UNIX-related businesses -- the source-code business and the UNIXWARE product business -- is key.

When the APA was executed, Novell could not transfer the UNIX mark to SCO; it had exclusively licensed that mark to X/Open, and the mark had since come to identify products licensed by X/Open and conforming to X/Open's specifications. But Novell <u>could</u> transfer its remaining rights in the source-code business: namely, the rights to issue maintenance releases and receive royalties for products licensed prior to the Licensing Agreement. And Novell still owned the UNIXWARE business in its entirety; this business, too, went to SCO. In this way, the APA was entirely consistent with Novell's Licensing Agreement with X/Open. The APA expressly referenced that agreement when it excluded from the transfer to SCO "any compensation [Novell] receives with respect of the license granted to X/Open regarding the UNIX trademark." This confirms that the APA was reached in full contemplation of the Licensing Agreement. We see no genuine issue of fact on the effect of the APA; it transferred only the UNIXWARE product business and the portion of the UNIX source-code business that Novell retained following the Licensing Agreement -- which did <u>not</u> include the UNIX trademark.[5]

---

[5] Gray repeatedly insists that this Court must consider the Utah District Court's decision in <u>SCO Group, Inc. v. Novell, Inc.</u>, No. 2:04-cv-00139, 2007 WL 2327587 (D. Utah Aug. 10, 2007),

13

This point was reinforced by the Confirmation Agreement, notably executed by all three Defendants. Given that the APA had not altered Novell's obligations under the Licensing Agreement in the first place, it is not clear that Novell and SCO needed to modify the APA -- but they certainly had the right to do so under California law (which they chose to govern the APA). Cal. Civ. Code § 1698(a) ("A contract in writing may be modified by a contract in writing."). And the parol evidence rule does not preclude our consideration of subsequent agreements. Cal. Civ. Proc. Code § 1856. Accordingly, we conclude that the Confirmation Agreement reaffirmed that Novell would be assigning ownership of the UNIX mark to X/Open.[6] The post-Confirmation Agreement amendment to the APA --

---

rev'd in part, 578 F.3d 1201 (10th Cir. 2009), in which -- he claims -- Novell admitted (and the Utah District Court accepted) that Novell had transferred the UNIX trademark to SCO via the APA. But as the District Court in this case recognized, the issue before the Utah court was the ownership of the UNIX and UNIXWARE copyrights -- not the trademarks with which we are concerned. We are not bound by a decision involving an issue wholly distinct from the issue before this Court. See Pleming v. Universal-Rundle Corp., 142 F.3d 1354, 1359 (11th Cir. 1998) (collateral estoppel requires that the issue on appeal be "identical to the one involved in the prior proceeding," and that it was actually litigated in that prior proceeding).

[6] Gray disputes this conclusion, and he argues that the Confirmation Agreement is unlawful insofar as it references the transfer of the UNIX mark to X/Open. He notes that the Confirmation Agreement references a Licensing Agreement executed on 14 May 1994, and that the Licensing Agreement at issue in this case was executed on 10 May. On this basis, Gray insists that Novell and X/Open must have entered into a second licensing agreement only four days after signing the agreement we have reviewed, and that this second agreement included the parties' actual obligations for the UNIX mark. Because Gray offers nothing to support this speculative assertion (that a second, unseen agreement actually exists), and because the Confirmation Agreement is perfectly compatible with the Licensing Agreement we have reviewed, we conclude that a reasonable fact-finder could not reject X/Open's explanation -- which was accepted by the District Court -- that the Confirmation Agreement merely contained a typographical error about the date of the Licensing Agreement.

14

excluding all trademarks from the transfer except those SCO "require[d]" -- further supports this conclusion, as SCO did not need the UNIX mark to carry out the business it acquired: it was X/Open, not SCO, who needed that mark for its specification-based licensing. We conclude (as did the District Court) that the Deed of Assignment accomplished the transfer that the Licensing Agreement, APA, and Confirmation Agreement all contemplated: transferring to X/Open ownership of the UNIX mark.

Having set forth the legal effect of these transactions, it becomes clear that all of Gray's claims must fail. Gray's common law claims for fraud and conspiracy to defraud depend on his allegation that the Defendants misrepresented that X/Open owned the UNIX mark. See Pettinelli v. Danzig, 722 F.2d 706, 709 (11th Cir. 1984) (explaining that common law fraud requires some misrepresentation). But X/Open was the mark's lawful owner; no fraud arose in the Defendants' representations to this effect.

Gray's federal and Florida RICO claims, as well as his claims under the Florida Communications Fraud Act, all allege that Defendants fraudulently schemed to conceal the UNIX mark's owner. But again, these claims fail in the light of the fact that X/Open truly did own the mark following the 1998 assignment from Novell; there was no fraudulent scheme. 18 U.S.C. § 1962(c) (requiring a

15

"pattern of racketeering activity"); Fla. Stat. § 895.03(3) (same); Fla. Stat. § 817.034(4)(a) (requiring a scheme to defraud).

Gray's claims of fraudulent trademark registration, fraud on the PTO, and unfair competition all also fail in the light of the fact that X/Open was the true owner of the UNIX mark when it registered with the PTO its receipt of that mark from Novell. 15 U.S.C. § 1120 ("Any person who shall procure registration in the Patent and Trademark Office of a mark by a <u>false or fraudulent declaration or representation</u> . . . shall be liable . . . ."); 15 U.S.C. § 1125(a)(1) (establishing civil liability for anyone who "uses in commerce . . . any false designation of origin" likely to deceive); 18 U.S.C. § 1001(a) (establishing criminal liability for anyone who makes a false representation in any matter within the federal government's jurisdiction). Because each and every one of Gray's claims depends on the common allegation that X/Open did not own the UNIX mark, he cannot prevail.

## IV.  <u>Conclusion</u>

Concluding that no genuine issues of material fact exist on the ownership of the UNIX mark, we also conclude that the District Court properly granted

16

summary judgment against Gray on all claims.[7]  We therefore affirm the District

Court's decision in all parts.

AFFIRMED.

---

[7] Because we conclude that Gray is entitled to no relief on any of his claims, it is not necessary to address the issue of damages (on which the District Court also granted summary judgment against Gray.)