[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 14-11014
Non-Argument Calendar

D.C. Docket No. 2:10-cv-00099-LGW-JEG

CHRISTOPHER LENNING,

Plaintiff-Appellant,

versus

BRANTLEY COUNTY, GEORGIA,
SHERIFF ROBERT THOMAS,
GLYNN COUNTY, GEORGIA,
JOHN SIMPSON, JR.,
KEVIN JONES,

Defendants-Appellees,

GEORGIA DEPARTMENT OF PUBLIC SAFETY,

Defendant.

---

Appeal from the United States District Court
for the Southern District of Georgia

---

(August 28, 2014)

Before HULL, MARCUS and ANDERSON, Circuit Judges.

PER CURIAM:

After an armed standoff with police, plaintiff Christopher Lenning brought suit pursuant to 42 U.S.C. § 1983, alleging, inter alia, that defendant Kevin Jones used excessive force to seize him in violation of the Fourth Amendment. The district court granted defendant Jones's motion for summary judgment, and Lenning appeals.

After review of the record and the parties' briefs, we affirm.

## I. BACKGROUND

### A.    Lenning's Initial Aggravated Assault

At approximately 7 p.m. on June 23, 2008, a citizen reported that a man was walking down a road in Brantley County, Georgia while pointing a long-barreled gun at his head. Brantley County law enforcement officers responded to the scene and found plaintiff Lenning walking by the side of the road with a gun.

2

The officers ordered Lenning to drop his gun.  Instead of complying, Lenning—still armed—walked towards the officers' patrol car.  After ignoring more commands to drop his gun, Lenning opened his gun's action and looked through the barrel; he then quickly closed the action and resumed his march towards the officers.  Lenning pointed his gun at the officers and shouted, "Y'all are going to have to shoot me."

When he was approximately ten yards from the officers' patrol car, Lenning again yelled at the officers to shoot him.  Then, Lenning walked away, stopping "every so often" to point his gun at the officers.  When Lenning reached a wooded area, he began to run, eventually making it to his nearby home.

Because Lenning had pointed his gun at multiple officers and threatened them, a Brantley County lieutenant secured a warrant for Lenning's arrest.

## B.    Request for SWAT Team Assistance

The responding officers followed Lenning to his home, where he had barricaded himself.  Lenning continued to ignore the officers' demands to drop his gun.

After Lenning refused arrest and refused to surrender his gun, the Brantley County Police Department requested assistance from the Glynn County, Georgia SWAT team and the Georgia state patrol SWAT team.

3

### C.    Attempted Negotiations

At approximately 8 p.m., Trooper Robbie Jump, a senior Georgia state trooper and trained crisis and hostage negotiator, responded to Brantley County's request for assistance.  After arriving at Lenning's home, Trooper Jump took cover behind another officer's patrol car, which was approximately 100 feet from Lenning's home.  The responding officers and Lenning were armed—each side pointing a gun at the other and each side telling the other to put its weapon down.

While in this tense standoff, Trooper Jump began a dialog with Lenning over the patrol car's public address system.  Trooper Jump's negotiation with Lenning lasted more than an hour.  Initially, Lenning stood in the road in front of his home waving a long-barreled gun back and forth and "hollering out different slurs."  Repeatedly, Trooper Jump told Lenning to drop his gun.  Lenning refused.  Multiple times, Lenning said that he had more guns and that his home was "trapped with C4."  During the negotiation, Lenning ran several times from the yard, to the front porch, to the inside of his home.

Lenning "kept coming out swinging [his gun] around, threatening to shoot [the officers]."  The officers took cover behind vehicles and other objects to ensure their safety.  But, Lenning "kept coming, waving the gun, [and] threatening to kill [them]."

4

Eventually, Trooper Jump convinced Lenning to relinquish his weapon in exchange for a pack of cigarettes. However, after this gun-for-cigarettes exchange, Lenning immediately pulled a pistol from the back of his pants.

Notwithstanding this setback, Trooper Jump continued his negotiations, which were "strictly yelling back and forth." Trooper Jump suspected that Lenning was under the influence of drugs or alcohol because Lenning would "get very high and irate, holler, scream, yell; and, then, in a few minutes, he would calm down."

## D.    Glynn County SWAT Team

Night fell, and it became dark. At some point, the Glynn County SWAT team arrived on the scene. After receiving briefing, members of that SWAT team began to set up an "inner" perimeter around Lenning's home, and the Brantley County officers retreated and formed an "outer" perimeter. The inner perimeter was designed to contain Lenning to prevent his escape, and the outer perimeter was designed to keep civilians out of the volatile area. The Glynn County SWAT team expected to maintain the inner perimeter until the Georgia state patrol SWAT team arrived and took over that responsibility.[1]

---

[1]The Georgia state patrol SWAT team did not arrive on the scene during the events relevant to this case.

5

Lenning continued his prior behavior of running onto the road and then running back into his home for ten or fifteen minutes. Lenning did this several times. After one of his many trips inside his home, Lenning came out of his home armed with a long-barreled gun.

E.    **SWAT Team Members Jones and Hogue's Approach**

Glynn County SWAT team members were assigned to secure each corner of Lenning's home. Relevant to this appeal, SWAT team members Kevin Jones and Garrett Hogue were assigned to the front, right corner of Lenning's home, near a parked car. Officer Jones carried two guns and a Taser that had a range of 25 feet. Officer Hogue was also armed.

To reach their assigned post at the front, right corner of Lenning's home, Officers Jones and Hogue first made their way across a wooded lot across the street from Lenning's home. As they did so, Lenning shouted that he heard their movement. Officers Jones and Hogue immediately stopped their approach.

Sometime later, Lenning went into his home, which gave Officers Jones and Hogue an opportunity to continue towards their assigned position. After Jones and Hogue crossed the road in front of Lenning's home, they entered an undeveloped lot to the right of his home. However, at that point, Lenning—still armed—left his house and returned to his front yard. Because of Lenning's untimely return and to

6

avoid detection, Jones and Hogue were forced to take cover by lying prone in a ditch beside Lenning's front yard. At this point, Jones was 57 feet from the car in Lenning's driveway, which meant that Jones was outside the 25-foot operating range of his Taser.

**F.    Lenning's Attempted Shot and Jones's Response**

At some point, Lenning sat down in the driver's seat of a car parked in his front yard and smoked a cigarette. Trooper Jump continued to dialog with Lenning, repeating his order to put his gun down.

Lenning screamed that Trooper Jump needed to tell the officers to back away. Trooper Jump responded that the officers had moved away from Lenning's house. Lenning retorted that he did not believe Trooper Jump and said, "I can see them and I'm going to fucking kill them."

Lenning then heard something from the woods near his driveway where Officers Jones and Hogue had taken cover. Lenning got out of the car, threw himself and his long-barreled gun across the hood of the car, aimed at the woods where Officers Jones and Hogue were positioned, and yelled in their direction, "I'm going to shoot you. I'm going to kill you." Trooper Jump told Lenning, "Put the gun down. We don't need it to go down like this."

7

Staring down the barrel of Lenning's gun and unable to see any part of Lenning's body other than his head, Officer Jones fired, striking Lenning in the eye.

## G.    Call for Assistance and Retrieval of Lenning's Weapon

After Lenning was shot, officers ran towards him and called an ambulance. Officers retrieved Lenning's long-barreled gun from the hood of his car and found it "cocked back as if somebody was preparing to shoot it." They also discovered that the gun was unloaded. However, given the angle from which Officer Jones saw Lenning aim his gun, Jones was unable to tell whether Lenning's gun was loaded.

Lenning lost his eye; he also lost his memory of the events in and around June 23, 2008.

## H.    Subsequent History

For his acts on June 23, 2008, Lenning pled guilty in state court to one count of felony obstruction and six counts of aggravated assault. He received an aggregate 30-year sentence for these offenses.

Lenning brought this civil action against Brantley County, Glynn County, the Georgia Department of Public Safety, Brantley County Sheriff Robert Thomas, Lieutenant John Simpson, and SWAT team member Jones. Lenning's complaint

8

alleged federal constitutional claims, including excessive force claims, and state law tort claims.

After discovery, the defendants moved for summary judgment on all of Lenning's claims. The district court granted the defendants' motion. Lenning now appeals two of his claims against defendant Jones:  excessive force and state law negligence.[2]

## II.  EXCESSIVE FORCE CLAIM

Lenning alleges that Glynn County Officer Jones exercised unconstitutionally excessive force when he shot Lenning in the eye. Jones asserts that he is entitled to qualified immunity.

### A.    Qualified Immunity Principles

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quotation marks omitted).  To receive qualified immunity, the government official "must first

---

[2]We review de novo a district court's summary judgment decision, applying the same legal standards as those that governed the district court. Capone v. Aetna Life Ins. Co., 592 F.3d 1189, 1194 (11th Cir. 2010).  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (quotation marks omitted).

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id. The plaintiff does so by showing that (1) the defendant violated a constitutional right and (2) that right was clearly established at the time of the alleged violation. Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004).

The parties agree that Officer Jones acted within his discretionary authority on the evening of June 23, 2008. Therefore, plaintiff Lenning must show that Jones's conduct violated Lenning's clearly established Fourth Amendment right to be free from seizure through excessive force.

## B.    Excessive Force Principles

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen [are] analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989) (emphasis omitted). The reasonableness determination requires "a careful

10

balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake." Jackson v. Sauls, 206 F.3d 1156, 1169-70 (11th Cir. 2000).  The reasonableness inquiry is objective.  Id. at 1170.

In its objective-reasonableness inquiry, this Court considers many factors, including (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others, including the possibility that the suspect was violent, dangerous, or armed; (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight; (4) whether the police action took place in the context of effecting an arrest; (5) the need for the application of force; (6) the relationship between the need for force and the amount of force used; (7) the duration of the action; (8) the number of persons with whom the police officers must contend at one time; (9) the extent of the injury inflicted; and (10) whether the force was applied in good faith or maliciously and sadistically.  Id. at 1170 n.18.

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  Id. at 1170 (quotation marks omitted).

11

"Therefore, use of force must be judged on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. (quotation marks omitted) (alterations adopted).

## C.    Application to Lenning's Case

When Officer Jones's bullet struck him, plaintiff Lenning was seized within the meaning of the Constitution. See Carr v. Tatangelo, 338 F.3d 1259, 1268 (11th Cir. 2003) ("Although [the plaintiff] was not immediately stopped by the bullet from [the officer's] gun, he nevertheless was seized within the meaning of the Fourth Amendment when the bullet struck or contacted him."). Thus, the question is whether Officer Jones's actions were "objectively reasonable" in light of the particular facts and circumstances confronting him. Jackson, 206 F.3d at 1170 (quotation marks omitted). They were.

Officer Jones knew that Lenning had barricaded himself by arming himself with many weapons and by threatening to use explosives. Jones also observed Lenning wave his long-barreled gun at several officers, heard Lenning yell that he would shoot the officers, and witnessed Lenning repeatedly refuse to surrender his gun. After all of this, Jones observed Lenning commit a life-threatening offense: aiming his long-barreled gun at Jones, positioning himself on the car's hood to take the shot, and shouting, "I'm going to shoot you. I'm going to kill you."

12

Jones's use of deadly force in response to Lenning's aggressive and life-threatening conduct was objectively reasonable.  Lenning's conduct—aiming his gun at Jones, positioning himself to shoot, and stating that he would shoot and kill—created an immediate threat to Jones's safety.  See Jackson, 206 F.3d at 1170 (noting that this Court considers the severity of the crime at issue and whether the suspect's actions pose an immediate threat to the safety of an officer when evaluating the objective reasonableness of a seizure).  And, that conduct occurred after Lenning escaped an earlier attempt at arrest and after a long standoff with several police officers.  See id. (stating that resisting arrest and flight are relevant considerations).

And, given Lenning's position—lying prone across the hood of a car—Jones had only one target:  Lenning's head.  Moreover, given his distance from Lenning (more than 50 feet), Jones could not deploy his Taser (which had a 25-foot range).  Thus, there was no less-deadly alternative at Jones's disposal in the brief moment he had to react to save his own life.  See id. (stating that the need for force, the amount of force, and the extent of the injury are relevant factors).

These facts support the conclusion that Jones took objectively reasonable action in the split-second between Lenning's threat of deadly force and Jones's responsive shot.  Because Jones did not violate Lenning's Fourth Amendment right

13

in taking that shot, the district court did not error in concluding that Lenning was entitled to qualified immunity as to Lenning's excessive force claim.[3]

### III. NEGLIGENCE CLAIM UNDER STATE LAW

Lenning also alleges that Officer Jones acted negligently in responding to the June 23, 2008 incident. Jones states that he is entitled to official immunity. Lenning counters by asserting that Jones is not entitled to official immunity with respect to the state law negligence claim because Jones acted "intentionally and with a complete and deliberate indifference to [Lenning's] rights."[4]

Under Georgia law, a public officer or employee—such as Jones—is entitled to official immunity unless he performed ministerial acts negligently or performed discretionary acts "with malice or an intent to injure." Cameron v. Lang, 549 S.E.2d 341, 344 (Ga. 2001).

---

[3]We reject Lenning's contention that the district court erred in relying on officers' reports in reaching its conclusion. These reports were viable summary judgment evidence that could be reduced to admissible form at trial. The district court did not err when it considered them.

[4]As a more general proposition, Lenning asserts, "The entire incident was handled poorly." To the extent that this statement is an attempt to appeal the district court's grant of summary judgment as to the negligence claim against defendants other than Jones, Lenning failed to adequately brief that issue on appeal. Thus, he has abandoned any such claim. See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 680-81 (11th Cir. 2014); see also Walter Int'l Prods. Inc. v. Salinas, 650 F.3d 1402, 1413 n.7 (11th Cir. 2011) (holding that the appellant abandoned a claim by making "nothing more than a passing reference" to it in the initial brief); Singh v. U.S. Att'y Gen., 561 F.3d 1275, 1278 (11th Cir. 2009) ("[S]imply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue and precludes our considering the issue on appeal.").

14

As noted above, the parties agree that Officer Jones acted within his discretionary authority on the evening of June 23, 2008.  See Golden v. Vickery, 645 S.E.2d 695, 696 (Ga. Ct. App. 2007) ("A discretionary act calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.").  Jones cannot be held liable for negligently performing those discretionary actions.  See Gilbert v. Richardson, 452 S.E.2d 476, 482-83 (Ga. 1994) ("According to the plain language of [the 1991 amendment to Article I, section II, paragraph IX(d) of the Georgia Constitution], state officers and employees . . . are subject to suit only when they negligently perform or fail to perform their 'ministerial functions . . . .' " (emphasis added)).

Jones could, however, be held liable for performing his discretionary actions "with malice or an intent to injure."  But, Lenning did not allege any such state law claim in his complaint.  Lenning only alleged a state law negligence claim.

Because Jones's actions on June 23, 2008 were discretionary and not ministerial, Lenning's state law negligence claim fails as a matter of law.  Thus, the district court did not err in finding that Jones was entitled to official immunity from Lenning's state law negligence claim.

15

## IV.  CONCLUSION

The district court's grant of summary judgment in favor of the defendants is affirmed.[5]

**AFFIRMED.**

---

[5]Lenning does not appeal the district court's grant of summary judgment in favor of the defendants on Lenning's many other claims.  Thus, he has abandoned those claims on appeal.  See Sapuppo, 739 F.3d at 680-81 (stating that a party abandons otherwise appealable issues when it fails to list issues in the statement of the issues presented on appeal or fails to adequately address such issues in the remainder of the opening brief).

16